## STATE OF WYOMING ET AL. *v.* UNITED STATES.

### APPEAL FROM THE CIRCUIT COURT OF APPEALS FOR THE EIGHTH CIRCUIT.

No. 257.   Argued October 6, 7, 1920.—Decided March 28, 1921.

1. Lands "in place " granted to a State for the support of schools, and subsequently included within a reservation by the United States, are exchangeable for unappropriated, non-mineral public lands of equal acreage outside the reservation, under the Act of February 28, 1891, c. 384, 26 Stat. 796, amending §§ 2275, 2276; Rev. Stats. P. 493.

2. Although, under other general provisions (Rev. Stats., §§ 441, 453, 2478), the lieu lands are selected by the State under the direction of the Secretary of the Interior, this implies no discretion in him or in the Land Department to refuse approval of selections duly made, their function here being purely the judicial one of determining whether selections, with accompanying surrenders of base land, complied with the act of Congress and the Secretary's directions, under the conditions existing at the time when the selections were made and completed. P. 496.

3. When such a selection, with accompanying waiver or surrender, has been duly made and completed, in full conformity with the act and the directions of the Secretary, the equitable title to the tract selected passes to the State, the United States acquiring a like title to the base land; and the rights of the State cannot be affected by a subsequent attempt by the executive to reserve the tract selected, or a subsequent discovery that it contains mineral. P. 497. *Wisconsin Central R. R. Co.* v. *Price County*, 133 U. S. 496, and *Cosmos Exploration Co.* v. *Gray Eagle Oil Co.*, 190 U. S. 301, explained.

4. It is a general rule that the question of the mineral or non-mineral character of land selected or entered shall be determined as of the time when the selector or entryman fully complied with all conditions precedent resting upon him. P. 500.

5. The exception to this rule found in the case of lands claimed under railroad aid grants, where the question of mineral character remains open until patent issues, is based upon the peculiar terms and subject-matter of the granting acts, their long administrative interpretation, and their restrictive construction in favor of the Government. P. 507.

6. Legislation of Congress designed to aid the common schools should be construed liberally rather than restrictively. P. 508.

7. The Act of June 25, 1910, c. 421, 36 Stat. 847, did not, and constitutionally could not, authorize executive withdrawal of land equitably vested in a State under a lieu selection. P. 509.

262 Fed. Rep. 675, reversed.

THE case is stated in the opinion.

*Mr. John W. Lacey*, with whom *Mr. William L. Walls*, Attorney General of the State of Wyoming, *Mr. D. A. Preston*, *Mr. H. S. Ridgely* and *Mr. Herbert V. Lacey* were on the briefs, for appellants.

*Mr. Assistant Attorney General Nebeker*, with whom *Mr. H. L. Underwood*, Special Assistant to the Attorney General, was on the brief, for the United States:

Until approval by the Secretary of the Interior, no title, legal or equitable, vests in the State under a lieu or exchange selection application. *Cosmos Exploration Co.* v. *Gray Eagle Oil Co.*, 190 U. S. 301; *State* v. *Hyde*, 88 Oregon, 1, 15, 16; *Wisconsin Central R. R. Co.* v. *Price County*, 133

U. S. 496, 511, 512; *Buena Vista Land Co.* v. *Honolulu Oil Co.*, 166 California, 71; *Roberts* v. *Gebhart*, 104 California, 67, 69–71; *Baker* v. *Jamison*, 54 Minnesota, 17, 27, 28.

In those cases where it is held that a selection vests title in the applicant, the word "selection" means approved selection. *Wisconsin Central R. R. Co.* v. *Price County, supra*, 514.

It is true the filing of a selection application operates to give the selector a preference right as against one tendering a filing thereafter, unless the latter is in support of a settlement or right initiated prior to the filing. *Weyerhaeuser* v. *Hoyt*, 219 U. S. 380, 387, 388, 391, 392. But this principle applies to the relative rights of individual claimants, not to the right of the United States to retain title. *Stalker* v. *Oregon Short Line R. R. Co.*, 225 U. S. 142, 149.

We do not attempt to deny the well settled rule that, where one has done all that is required of him with respect to securing a tract of public land, he acquires rights against the Government and conditions arising after that time are not to be considered in determining his right to the land. But that rule is founded upon the theory that by such compliance with the law the applicant has acquired an equitable title to the land; that in equity the land is his and the Government holds it in trust for him. *Wirth* v. *Branson*, 98 U. S. 118, 121; *Cornelius* v. *Kessel*, 128 U. S. 456, 459; *Benson Mining Co.* v. *Alta Mining Co.*, 145 U. S. 428, 432–434.

Obviously the rule has no application to a case in which the performance of some act by a public official is a condition precedent to the vesting of an equitable title.

It is well settled as to railroad indemnity lands that no title vests until the application to select is made and approved by the Secretary of the Interior. *Sioux City & St. Paul R. R. Co.* v. *Chicago, Milwaukee & St. Paul Ry. Co.*, 117 U. S. 406, 408; *Northern Pacific Ry. Co.* v. *McComas*, 250 U. S. 387, 391, 392.

The withdrawal of the land as mineral, and the establishment of its mineral character prior to approval, barred acquisition thereof by the State. Act of June 25, 1910, c. 421, § 1, 36 Stat. 847; Administrative Ruling, 43 L. D. 293.

Such a filing as the one now under consideration is obviously unlike homestead or other claims upon which final proofs have been submitted and in which the claimants have done all that is necessary under the law to vest them with an equitable title.

It is well established, also, that mere settlement upon lands of the United States with a declared intention to obtain title thereto under the preëmption laws does not give a vested interest in the premises so as to deprive Congress of the power to divest it by grant to another. *Frisbie* v. *Whitney*, 9 Wall. 187; *Yosemite Valley Case*, 15 Wall. 77; *Shepley* v. *Cowan*, 91 U. S. 330; *Russian-American Packing Co.* v. *United States*, 199 U. S. 570, 577, 578; *Wagstaff* v. *Collins*, 97 Fed. Rep. 3, 8.

The doctrine of relation is inapplicable. *United States* v. *Detroit Lumber Co.*, 200 U. S. 321, 334; *United States* v. *Morrison*, 240 U. S. 192, 212.

The selected land is mineral in character. If we consider that §§ 2275 and 2276, Rev. Stats., constitute a grant, it is clear that this land can not pass to the State, since mineral lands were excepted. The case would therefore fall within the rule of *Barden* v. *Northern Pacific R. R. Co.*, 154 U. S. 288; *Burke* v. *Southern Pacific R. R. Co.*, 234 U. S. 669; *United States* v. *Southern Pacific Co.*, 251 U. S. 1; *United States* v. *Sweet*, 245 U. S. 563.

If, however, the sections be construed as conferring merely a privilege of exchange, then the case would come under the rule that until equitable title passes, in this case until approval, the matter of the character of the land is open to determination. *Leonard* v. *Lennox*, 181 Fed. Rep. 760.

Again, even if the transaction is in the nature of a contract, created by the acceptance by the State of the invitation or privilege given by the United States, we assert that the State is bound by the terms offered, one of which was that only non-mineral land might be selected. Certainly the State could not expect that its own showing as to the character of the land was to be conclusive and to bar the right of the United States, through its proper officer, from inquiring into that matter. *Roughton* v. *Knight*, 219 U. S. 537, 547. Distinguishing, *Daniels* v. *Wagner*, 237 U. S. 547.

MR. JUSTICE VAN DEVANTER delivered the opinion of the court.

This is a suit by the United States to establish title in it to eighty acres of land and to the proceeds of oil taken therefrom. The District Court rendered a decree dismissing the bill on the merits, which the Circuit Court of Appeals reversed, 262 Fed. Rep. 675, and the defendants bring the case here.

One of the defendants, the State of Wyoming,[1] claims under a lieu selection, made in 1912, and the other defendants under a lease from the State, made in 1916. It is against the selection and the lease that the United States seeks to establish title.

By the Act of July 10, 1890, c. 664, § 4, 26 Stat. 222, Congress granted to the State for the support of common schools certain lands in place (sections 16 and 36 in each township), with exceptions not material here; and by the Act of February 28, 1891, c. 384, 26 Stat. 796, amending §§ 2275, 2276, Rev. Stats., the State was invited and entitled, in the event any of the designated lands in

---

[1] The State was not made a party at first, but afterwards at its own request was admitted as a defendant to enable it to defend the lieu selection.

place after passing under the school grant should be included within a public reservation, to waive its right thereto and select in lieu thereof other lands of equal acreage from unappropriated non-mineral public lands outside the reservation and within the State. See *California* v. *Deseret Water, etc., Co.*, 243 U. S. 415; *Payne* v. *New Mexico, ante,* 367.. Other laws of general application, §§ 441, 453, 2478, Rev. Stats., required that the selections be made under the direction of the Secretary of the Interior. ·

In 1897 a tract in place which had passed to the State under the school grant was included within a public reservation, called the Big Horn National Forest. On April 4, 1912, the State—through its Governor, Joseph M. Carey, and its Land Commissioner, S. G. Hopkins— filed in the proper local land office a selection list waiving its right to that tract and selecting in lieu thereof other land of the same area from public lands within the State and outside the forest reserve. The land so selected included the eighty acres now in controversy. At that time the State had a perfect title to the tract in the reserve and the land selected in lieu thereof was vacant, unappropriated, and neither known nor believed to be mineral. The list fully conformed to the directions on the subject issued by the Secretary of the Interior and was accompanied by the requisite proofs and the proper fees. Notice of the selection was regularly posted and published, proof thereof was duly made and the State paid the publisher's charge. Thus, as the Circuit Court of Appeals said, "the State did everything necessary to show a perfect title to the land relinquished and perfect relinquishment thereof to the government, and everything that was required either by statute or regulation of the Land Department" in selecting the lieu land instead of the relinquished tract.

No objection was called forth by the notice and in

regular course the local officers transmitted the list and
other papers to the General Land Office with a certificate
stating that no adverse filing, entry or claim to the se-
lected land was shown by the records in their office and
that the filing of the list was allowed and approved by
them.    The list remained in the General Land Office
awaiting consideration by the Commissioner for upwards
of three years.    In the meantime, on May 6, 1914, two
years after the selection, the selected land, with other
lands aggregating more than 88,000 acres, was included
in a temporary executive withdrawal as possible oil land
under the Act of June 25, 1910, c. 421, 36 Stat. 847.    On
April 29, 1915, the Commissioner, coming to consider
the selection, declined to approve it as made and called
on the State either to accept a limited—surface right—
certification of the selected land or to show that it still
was not known or believed to be mineral.    The State
declined to accede to either alternative and insisted that
its rights should be determined as of the time when the
waiver and selection were made and that, applying that
test, it became invested with the equitable title to the
selected land two years prior to the temporary with-
drawal and at a time when that land plainly was neither
known nor believed to be mineral.    The Commissioner
thereupon ordered the selection canceled,—not because
it was in any respect objectionable when made, but on
the theory that he was justified in rejecting it by reason
of the subsequent withdrawal and subsequent oil dis-
coveries in that vicinity.    The State appealed to the
Secretary of the Interior, and, on October 25, 1916, he
affirmed the Commissioner's action.

In the meantime, on May 24, 1916, the State had
given to the defendant Ridgely a lease permitting him
to drill the selected land for oil, and the lease had been
assigned to the defendant oil company.    There was no
oil discovery, nor any drilling, on the selected land up

to the time the lease was given; but thereafter the oil company began drilling and at large cost carried the same to discovery and successful production. This was four years after the selection.

The question presented is whether, considering that the selection was lawfully made in lieu of the state-owned tract contemporaneously relinquished, and that nothing remained to be done by the State to perfect the selection, it was admissible for the Commissioner and the Secretary to disapprove and reject it on the ground that the selected land was withdrawn two years later under the Act of June 25, 1910, and still later was discovered to be mineral land, that is, to be valuable for oil. Or, putting it in another way, the question is whether it was admissible for those officers to test the validity of the selection by the changed conditions when they came to examine it, instead of by the conditions existing when the State relinquished the tract in the forest reserve and selected the other in its stead.

In principle it is plain that the validity of the selection should be determined as of the time when it was made, that is, according to the conditions then existing. The proposal for the exchange of land without for land within the reserve came from Congress. Acceptance rested with the State and of course would be influenced and controlled by the conditions existing at the time. It is not as if the selection was merely a proposal by the State which the land officers could accept or reject. They had no such option to exercise, but were charged with the duty of ascertaining whether the State's waiver and selection met the requirements of the congressional proposal and of giving or withholding their approval accordingly. The power confided to them was not that of granting or denying a privilege to the State, but of determining whether an existing privilege conferred by Congress had been lawfully exercised;—in other words,

their action was to be judicial in its nature and directed to an ascertainment and declaration of the effect of the waiver and selection by the State in 1912. If these were valid then—if they met all the requirements of the congressional proposal, including the directions given by the Secretary—they remained valid notwithstanding the subsequent change in conditions. Acceptance of such a proposal and full compliance therewith confer vested rights which all must respect. Equity then regards the State as the owner of the selected tract and the United States as owning the other; and this equitable ownership carries with it whatever of advantage or disadvantage may arise from a subsequent change in conditions whether one tract or the other be affected. Of course the State's right under the selection was precisely the same as if in 1912 it had made a cash entry of the selected land under an applicable statute, for the waiver of its right to the tract in the forest reserve was the equivalent of a cash consideration. And yet it hardly would be suggested that the Commissioner or the Secretary on coming to consider the cash entry could do otherwise than approve it, if at the time it was made the land was open to such an entry and the amount paid was the lawful price.

The conclusion which we deem plain in principle is fully sustained by prior adjudications. In *Benson Mining Co.* v. *Alta Mining Co.*, 145 U. S. 428, which presented the question of when under the public land laws a right to the land becomes vested, it was said, p. 431: "When the price is paid the right to a patent immediately arises. If not issued at once, it is because the magnitude of the business in the Land Department causes delay. But such delay, in the mere administration of affairs, does not diminish the rights flowing from the purchase, or cast any additional burdens on the purchaser, or expose him to the assaults of third parties." And again, p. 432: "It is a general rule, in respect to the sales of real estate,

that when a purchaser has paid the full purchase price his equitable rights are complete, and there is nothing left in the vendor but the naked legal title, which he holds in trust for the purchaser. And this general rule of real estate law has been repeatedly applied by this court to the administration of the affairs of the Land Department of the government; and the ruling has been uniform, that whenever, in cash sales, the price has been paid, or, in other cases, all the conditions of entry performed, the full equitable title has passed, and only the naked legal title remains in the government in trust for the other party, in whom are vested all the rights and obligations of ownership." In *Colorado Coal & Iron Co.* v. *United States,* 123 U. S. 307, a title obtained through preëmption cash entries was assailed on the ground that the land was shown by subsequent discoveries to be mineral; but the attack failed, the court saying, p. 328: "A change in the conditions occurring subsequently to the sale, whereby new discoveries are made, or by means whereof it may become profitable to work the veins as mines, cannot affect the title as it passed at the time of sale. The question must be determined according to the facts in existence at the time of the sale." In *United States* v. *Iron Silver Mining Co.,* 128 U. S. 673, a title acquired through an application for a placer patent was sought to be annulled on the ground that subsequent mining disclosed that the land was lode land; but the title was sustained, the court observing, p. 683: "The subsequent discovery of lodes upon the ground, and their successful working, does not affect the good faith of the application. That must be determined by what was known to exist at the time." Particularly in point is *Shaw* v. *Kellogg,* 170 U. S. 312, which related to what is called Baca Tract No. 4. Congress had accorded to the heirs of Luis Maria Baca the right to relinquish their claim to a large body of land in New Mexico and to select

instead "an equal quantity of vacant land, not mineral,"· in not exceeding five tracts in that Territory. As here, there was no provision for a patent. The original claim was relinquished and the lieu selection made conformably. to directions given by the Land Department, the selected land being represented as vacant and not known to be mineral. Afterwards the selection of a part of Tract No. 4 was called in question on the ground that it was shown by subsequent discoveries to be mineral. This court sustained the selection and said, p. 332: "The grantees, the Baca heirs, were authorized to select this body of land. They were not at liberty to select lands already occupied by others. The lands must be vacant. Nor were they at liberty to select lands which were then known to contain mineral. Congress did not intend to grant any mines or mineral lands, but with these exceptions their right of selection was coextensive with the limits of New Mexico. We say 'lands then known to contain mineral,' for it cannot be that Congress intended that the grant should be rendered nugatory by any future discoveries of mineral. The selection was to be made within three years. The title was then to pass, and it would be an insult to the good faith of Congress to suppose that it did not intend that the title when it passed should pass absolutely, and not contingently upon subsequent discoveries. This is in accord with the general rule as to the transfer of title to the public lands of the United States. In cases of homestead, preëmption or townsite entries, the law excludes mineral lands, but it was never doubted that the title once passed was free from all conditions of subsequent discoveries of mineral." In *Leonard* v. *Lennox*, 181 Fed. Rep. 760, a contention that an application for a non-mineral final entry, even if regularly presented and based on full compliance with the law, should be disallowed and rejected where the land subsequently is discovered to be mineral (coal) was

overruled by the Circuit Court of Appeals of the Eighth
Circuit, the court saying, p. 764: "This insistence cannot
prevail. It not only is opposed to the settled rule that the
character of the land—whether agricultural or known to
be chiefly valuable for coal—must be determined ac-
cording to the conditions existing at the time when the
applicant does all that he is required to do to entitle him
to a patent, but is grounded in a misapprehension of the
authority and duty of the officers of the Land Department
in respect of such an application. Whilst it undoubtedly
is subject to examination and consideration by them,
this is not that they may elect whether or not they will
consent to its allowance, but that they may ascertain
whether or not the applicant has acquired a right to its
allowance—a right which is acquired, if acquired at all,
at that point of time when the applicant has done all
that he is required to do in the premises instead of at the
time of its recognition by them." The last expression
on this subject in this court is found in *Payne* v. *New
Mexico, ante,* 367, where it was held in respect of a state
lieu selection like the one in question here that the Com-
missioner and the Secretary in acting thereon are required
to give effect to the conditions existing when it was made,
that if it was valid then they are not at liberty to dis-
approve or cancel it by reason of a subsequent change
in conditions and that in this regard the statute under
which the selection was made does not differ from other
land laws offering a conveyance of the title to those who
accept and fully comply with their terms.

The Land Department uniformly has ruled that the
States acquire a vested right in all school sections in place
which are not otherwise appropriated, and not known to be
mineral, at the time they are identified by the survey,—or
at the date of the grant where the survey precedes it,—re-
gardless of when the matter becomes a subject of inquiry
and decision, and that this right is not defeated or affected

by a subsequent mineral discovery. *California v. Poley*, 4 Copp's L. O. 18; *Abraham L. Minor*, 9 L. D. 408; *Rice v. California*, 24 L. D. 14; *United States v. Morrison*, 240 U. S. 192, 207; *United States* v. *Sweet*, 245 U. S. 563, 572. And as respects cash entries and entries under the preemption, homestead, desert land and kindred laws the Land Department always has ruled that if, when the claimant has done all that he is required to do to entitle him to receive the title, the land is not known to be mineral he acquires a vested right which no subsequent discovery of mineral will divest or disturb. *Harnish* v. *Wallace*, 13 L. D. 108; *Rea v. Stephenson*, 15 L. D. 37; *Reid* v. *Lavallee*, 26 L. D. 100, 102; *Aspen Consolidated Mining Co.* v. *Williams*, 27 L. D. 1, 17; *Diamond Coal & Coke Co.* v. *United States,* 233 U. S. 236, 240. And this rule has been applied by that department, although not uniformly, to selections made in lieu of relinquished lands in public reservations. Thus in *Kern Oil Co.* v. *Clarke,* 30 L. D. 550, where a lieu selection under the Act of June 4, 1897, c. 2, 30 Stat. 36, was under consideration, the Secretary of the Interior said, p. 556: "When do rights under the selection become vested? In the disposition of the public lands of the United States, under the laws relating thereto, it is settled law: (1) That when a party has complied with all the terms and conditions necessary to the securing of title to a particular tract of land, he acquires a vested interest therein, is regarded as the equitable owner thereof, and thereafter the government holds the legal title in trust for him; (2) that the right to a patent once vested, is, for most purposes, equivalent to a patent issued, and when in fact issued, the patent relates back to the time when the right to it became fixed; and (3) that the conditions with respect to the state or character of the land, as they exist at the time when all the necessary requirements have been complied with by a person seeking title, determine the question whether the land is subject to

sale or other disposal, and no change in such conditions, subsequently occurring can impair or in any manner affect his rights." Again, p. 560: "These established principles, in the opinion of the Department, are applicable to selections under the act of June 4, 1897. The act clearly contemplates an exchange of equivalents. Such is the unmistakable import of its terms. In the case of the relinquishment of patented lands title is to be given by the government for title received." And again, p. 564: "It would be strange indeed, if by the latter [1897] act, Congress intended that one who, accepting the government's offer of exchange, relinquishes a tract to which he has obtained full title in a forest reservation, and in lieu thereof selects a tract of land which at the time is vacant and open to settlement, and does all that is required of him to complete the selection and to perfect the exchange, should thereby acquire only an inchoate right to the selected tract, liable to be defeated by subsequent discoveries of mineral at any time before patent, or before final action upon the selection by the land department. Such a construction would not only tend to defeat the objects for which the act was passed, by discouraging owners of lands in forest reservations from giving up their titles, but would be against both the letter and spirit of the act. Parties would be slow indeed to relinquish their complete titles if it were once understood that they could obtain only doubtful or contingent rights in return for them. It could not have been the intention of Congress that parties accepting the government's offer of exchange should be embarrassed by any such conditions of doubt and uncertainty."

That view was repeated and applied in many other departmental decisions dealing with lieu selections. But afterwards the Secretary, conceiving that the decisions of this court in *Wisconsin Central R. R. Co.* v. *Price County*, 133 U. S. 496, and *Cosmos Exploration Co.* v. *Gray Eagle Oil Co.*, 190 U. S. 301, justified him in so doing, ruled that

no right attached under such a selection unless and until
it was approved by him and therefore that, even though
the selection was awfully made, he possessed a discretion
to reject it and give effect to an intervening change in con-
ditions, as where a new claimant settled upon the land or
sought to make entry of it while the selection was pending.

Under this changed ruling the Secretary rejected several
selections lawfully made by one Daniels and awarded and
patented the land to others. Daniels then brought suits
against the patentees charging that by the selections he
acquired the equitable title, that his selections were re-
jected and the patents issued through a misapprehension
of the law, and therefore that the patentees took the legal
title in trust for him. Ultimately the suits came to this
court, and after a full review the changed ruling of the
Secretary was disapproved and Daniels' contention sus-
tained. *Daniels* v. *Wagner*, 237 U. S. 547. The substance
of the decision was that as the selections were lawful when
made "it was the plain duty" of the Secretary to approve
them; that the contrary view found no justification in
*Cosmos Exploration Co.* v. *Gray Eagle Oil Co.*, *supra;* and
that the real authority and duty of the Secretary in deal-
ing with such selections were pointed out in *Weyerhaeuser*
v. *Hoyt*, 219 U. S. 380, 387–388, where it was said: "The re-
quirement of approval by the Secretary consequently
imposed on that official the duty of determining whether
the selections were lawful at the time they were made,
which is inconsistent with the theory that any one could
appropriate the selected land pending action of the
Secretary. The scope of the power to approve lists of
selections conferred on the Secretary was clearly pointed
out in *Wisconsin Central Railroad* v. *Price*, 133 U. S. 496,
511, where it was said that the power to approve was
judicial in its nature. Possessing that attribute the
authority therefore involved not only the power but
implied the duty to determine the lawfulness of the selec-

tions as of the time when the exertion of the authority was invoked by the lawful filing of the list of selections."

As the Circuit Court of Appeals in the present case, like the Secretary in the other, regarded the decisions in the *Wisconsin Central Case* and the *Cosmos Case* as showing that no right attaches under a lieu selection unless and until approved by the Secretary, it is well to point out just what was involved in those cases; for it then will be apparent that there was no purpose in either to go to the length suggested.

The *Wisconsin Central Case* was a suit to enjoin the collection of a tax levied on land which at the time was covered by a pending indemnity selection under a railroad land grant. The Commissioner of the General Land Office had reported that the company already had received indemnity lands largely in excess of the losses for which it was entitled to indemnity, and the company was disputing that report. Until that controversy was determined it could not be known whether the company was entitled to an approval of the selection. In that situation the United States had such an interest in the land as made it non-taxable. Whether the selection was valid or otherwise was primarily a question for the Secretary of the Interior to determine. Ultimately he held it valid, but not until after the tax was levied—indeed, after the suit was brought. The suit involved the validity of the tax, and nothing more. Its purpose was not to control the action of the Secretary by a writ of mandamus or injunction, nor to determine the title as between the United States and the company or between the company and a grantee of the United States. True, the court, after commenting on the difference between the granted lands in place and the indemnity lands as respects the mode of identification, very broadly stated that an indemnity selection to be effective required the approval of the Secretary; but it was not meant by this that the Secretary arbitrarily could

defeat the right of selection by withholding his approval, nor that if through a mistake of law he rejected a selection which was valid at the time it was made the company would be remediless. There was no occasion to consider those questions, nor could they properly be determined without the presence of parties not then before the court. And that the court did not intend its words to be taken so broadly is illustrated by the fact that it cited with approval the case of *St. Paul & Sioux City R. R. Co.* v. *Winona & St. Peter R. R. Co.*, 112 U. S. 720, 733, wherein an indemnity selection lawfully made, but disapproved by the Secretary, was sustained against an adverse certification on the ground that "this erroneous decision of his" did not deprive the selector "of rights which became vested by its selection of those lands."

The *Cosmos Case* was a suit by a lieu land selector to establish his title as against others who were claiming under placer mining locations. The selection was not accompanied by proof that the land was not then occupied adversely, although that was required. Within the time prescribed by the regulations the mining claimants filed in the land office verified protests assailing the regularity and validity of the selection, setting up locations of the selected land made under the placer mining law prior to the selection and alleging that the lands "were not subject to selection" because "the same was mineral land and was included within" the mining locations. The protests were entertained and, with the selection, were pending when the suit was begun, which was shortly after the protests were filed. The suit was brought on the theory that by the selection the selector acquired "the full, complete and equitable title" to the selected land, notwithstanding he had not submitted any proof of non-occupancy, and that the protests were not such as could be entertained or investigated by the Land Department. That case and another (*Riverside Oil Co.* v. *Hitchcock*, 190 U. S. 316),

wherein a writ of mandamus was sought against the
Secretary by another lieu land selector, were heard and
disposed of as related cases, and the decision in one should
be read in connection with that in the other. The full
substance of the decision in the *Cosmos Case* is in the
following excerpt from the opinion, 190 U. S. 315: "Con-
cluding, as we do, that the question whether the complain-
ant has ever made a proper selection of land in lieu of the
land relinquished, has never been decided by the Land
Department, but is still properly before that department,
the courts cannot take jurisdiction and proceed to decide
such question themselves. The Government has provided
a special tribunal for the decision of such a question arising
out of the administration of its public land laws, and that
jurisdiction cannot be taken away from it by the courts.
*United States* v. *Schurz*, 102 U. S. 378, 395. The bill is not
based upon any alleged power of the court to prevent the
taking out of mineral from the land, pending the decision
of the Land Department upon the rights of the complain-
ant, and the court has not been asked by any averments in
the bill or in the prayer for relief to consider that question.
For the reasons stated, we think the bill does not state
sufficient facts upon which to base the relief asked for, and
that the defendants' demurrer to the same was properly
sustained." There are general expressions in the opinion,
which separated from the rest, might be taken as declaring
that no right vests under a lieu selection unless the Secre-
tary approves it; but that such a ruling was intended is
refuted by the opinion as a whole, and particularly by the
statements therein that the power of the Secretary is not
to be exercised arbitrarily and that his "decision of any
legal question would not, of course, be binding on the
courts" should the question properly arise in future
litigation. The general expressions were relied upon in
*Daniels* v. *Wagner*, as interpretative of the decision and
this court answered, "But we are of opinion that this

interpretation of the *Cosmos Case* cannot be justified." Besides, it was adjudged in the *Daniels Case* that a lieu selection which is lawful at the time it is made does invest the selector with equitable rights which he may enforce in an appropriate way where the Secretary through an error of law rejects the selection. And that ruling was re-affirmed and applied in *Payne v. Central Pacific Ry. Co.*, ante, 228; and *Payne v. New Mexico*, ante, 367.

The only exception to the general rule before stated respecting the time as of which the character of the land— whether mineral or non-mineral—is to be determined is one which in principle and practice is confined to railroad land grants. From the beginning the Land Department, by reason of the terms of those grants and the restrictive interpretation to which they are subjected, uniformly has construed and treated them as requiring that the character of the land be determined as of the time when the patent issues. In 1890 Secretary Noble, in declining to disturb this construction and practice, pointed out the reasons which had led the Department to make a distinction in this regard between those grants and other land laws, and said: "This practice, having been uniformly followed and generally accepted for so long a time, there should be, in my judgment, the clearest evidence of error, as well as the strongest reasons of policy and justice controlling, before a departure from it should be sanctioned. It has, in effect, become a rule of property." *Central Pacific R. R. Co. v. Valentine*, 11 L. D. 238, 246. In 1893 the matter came before this court and the construction and practice of the Land Department were sustained. *Barden v. Northern Pacific R. R. Co.*, 154 U. S. 288. As the opinion in that case shows, the court recognized that the mineral land exception in other land laws simply operates to exclude from sale, etc., "land known at the time to be mineral," and was careful to explain that its decision related to "grants in aid of

railroads " and to "no other grants." The grounds on which the decision was put were, (a) that the railroad land grants, besides being confined in the granting clause to lands "not mineral," contain provisos declaring in words or effect "that all mineral lands be, and the same hereby are, excluded from the operation of this " grant; (b) that such grants, although expressly requiring that the question whether the lands are otherwise excepted be determined as of the time the map of definite location is filed, contain no such provision in respect of the exception of mineral land; (c) that it was well understood that many years would necessarily elapse between the filing of the map and the time when by construction of the road the grantee would be entitled to patents, and as the grants covered great areas, in one instance nearly equal to that of Ohio and New York, it hardly could have been intended to arrest mineral development in those areas in the meantime; (d) that such grants "must be strictly construed," and "if they admit of different meanings, one of extension and one of limitation, they must be accepted in a sense favorable to the grantor;" and (e) that the long prevailing construction and practice of the Land Department ought not to be disturbed. Plainly the decision in that case is without bearing here, save as it recognizes that rights under other land laws are to be tested by a different rule. And this is emphasized by the fact that in *Shaw* v. *Kellogg, supra,* where the selection of Baca Tract No. 4 was involved, the court distinguished the *Barden Case,* and applied the general rule before stated. And it is of further significance that this court has recognized that the legislation of Congress designed to aid the common schools of the States is to be construed liberally rather than restrictively. *Beecher* v. *Wetherby,* 95 U. S. 517, 526; *Johanson* v. *Washington,* 190 U. S. 179, 183.

Of the executive withdrawal of the land two years after

the lieu selection was lawfully made, it suffices to say, following the recent decision in *Payne* v. *Central Pacific Ry. Co., ante,* 228, that the Act of 1910, under which the withdrawal was made, is confined to "public lands," that by the selection this land had ceased to be public, and that the act could not be construed to embrace it without working an inadmissible interference with vested rights.

It results that the Secretary erred in matter of law in rejecting the selection and that the District Court rightly entered a decree for the defendants. See *Cornelius* v. *Kessel,* 128 U. S. 456, 461; *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 338. The decree of the Circuit Court of Appeals is accordingly

*Reversed.*