## UNITED STATES ex rel. STATE OF NEW MEXICO v. ICKES, Secretary of the Interior.

### No. 6159.

United States Court of Appeals for the District of Columbia.

Argued May 7, 1934.

Decided June 11, 1934.

Chester I. Long, Peter Q. Nyce, S. W. McIntosh, and E. C. Radue, all of Washington, D. C., for appellant.

Nathan R. Margold, Charles Fahy, and Frederic L. Kirgis, all of Washington, D. C., for appellee.

Before MARTIN, Chief Justice, and ROBB, VAN ORSDEL, and GRONER, Associate Justices.

VAN ORSDEL, Associate Justice.

This action was brought in the Supreme Court of the District of Columbia by the state of New Mexico for a writ of mandamus to require appellee, defendant below, Secretary of the Interior, to adjudge the state of New Mexico entitled to section 16, township 20, range 29 east, as state school land; and to require the cancellation of stock driveway No. 4 (New Mexico No. 1) approved March 5, 1918, in so far as it affects said section; and also to cancel oil and gas prospecting permit, Las Cruces, N. M., 037185, and potash permit, Las Cruces, 043885, in so far as they cover said section.

It appears that by the Act of Congress, approved June 21, 1898, 30 Stat. 484, there was granted to the territory of New Mexico for school purposes sections 16 and 36 in each township in said territory. The act provided as follows: "That sections numbered sixteen and thirty-six in every township of the Territory of New Mexico, and where such sections, or any parts thereof, are mineral or have been sold or otherwise disposed of by or under the authority of any Act of Congress, other non-mineral lands equivalent thereto, in legal subdivisions of not less than one-quarter section, and as contiguous as may be to the section in lieu of which the same is taken, are hereby granted to said Territory for the support of common schools, such indemnity lands to be selected within said Territory in such manner as is hereinafter provided: Provided, That the sixteenth, and thirty-sixth sections embraced in permanent reservations for national purposes shall not at any time be subject to the grants of this Act, nor shall any lands embraced in Indian, military, or other reservations of any character be subject to the grants of this Act; but such reservations shall be subject to the indemnity provisions of this Act."

The New Mexico Enabling Act of June 20, 1910, 36 Stat. 557, 561, granted section 2 and 32 of every township to the state. The material parts of said act are as follows: "That in addition to sections sixteen and thirty-six, heretofore granted to the Territory of New Mexico, sections two and thirty-two in every township in said proposed State not otherwise appropriated at the date of the passage of this Act are hereby granted to the said State for the support of common schools; and where sections two, sixteen, thirty-two, and thirty-six, or any parts thereof, are mineral, or have been sold, reserved, or otherwise appropriated or reserved by or under the authority of any Act of Congress, or are wanting or fractional in quantity, or where settlement thereon with a view to preemption or homestead, or improvement thereof with a view to desert-land entry has been made heretofore or hereafter, and before the survey thereof in the field, the provisions of sections twenty-two hundred and seventy-five and twenty-two hundred and seventy-six of the Revised Statutes are hereby made applicable thereto and to the selection of lands in lieu thereof to the same extent as if sections two and thirty-two, as well as sections sixteen and thirty-six, were mentioned therein." Section 6.

The single question here involved is whether or not the title to the school section involved became vested in the state of New Mexico. The survey of section 16 was begun June 12, 1916, and completed June 15, 1916. The survey was approved by the United States Surveyor General's Office March 26, 1919, and accepted by the General Land Office July 7, 1919. At the time the survey was completed in the field there was no withdrawal or other disposition of the land within the exceptions of the above act. On November 12, 1917, after completion of the survey in the field, but before the approval of the survey by the Land Department, stock driveway withdrawal No. 4, was approved by the Secretary of the Interior, and on March 5, 1918, and also before the approval of the survey stock driveway withdrawal No. 4, which was a modification of the former withdrawal, was also approved by the Secretary. The oil and gas permits and the potash permit were subsequent to the approval of the survey by the Secretary, and are of no importance in the consideration of this case.

Appellant takes the position that, when the "survey in the field" was completed, the state of New Mexico acquired a vested right in the land in controversy. The government takes the position that vested right to school land under the acts here in question would

not attach until the survey was finally approved by the Secretary, and that, between the date of the completion of the survey in the field and the approval of the survey, the withdrawals for stock driveway purposes occurred, which, under the act, prevented the state from acquiring title to the land in question.

The language of the act "are hereby granted to the said State for the support of common schools" creates a grant in præsenti, and title to surveyed school land within the conditions of the act immediately became vested in the state, and title to unsurveyed land would attach at the time the land was sufficiently identified by survey under the provisions of the statute. As said in Leavenworth Railroad Company v. United States, 92 U. S. 733, 741, 23 L. Ed. 634: "It creates an immediate interest, and does not indicate a purpose to give in future. 'There be and is hereby granted' are words of absolute donation, and import a grant in præsenti. This court has held that they can have no other meaning; and the Land Department on this interpretation of them, has uniformly administered every previous similar grant."

Cases defining the effect of the railroad grants are all even of a more indefinite character than the school land grants. The grants to the railroads were incapable of determination until the course of the railroad was determined by survey and establishment of right of way, and then title would not vest in the lands until a certain mileage of the road had been constructed, and surveys made to determine the location of the odd sections within the grant. In St. Paul & Pacific R. Co. v. Northern Pac. R. Co., 139 U. S. 1, 11 S. Ct. 389, 35 L. Ed. 77, the court, interpreting the language used in the act, "that there be, and hereby is, granted to the Northern Pacific Railroad Company" as a grant in præsenti, said: "As seen by the terms of the third section of the act, the grant is one in præsenti; that is, it purports to pass a present title to the lands designated by alternate sections, subject to such exceptions and reservations as may arise from sale, grant, preemption, or other disposition previous to the time the definite route of the road is fixed. The language of the statute is 'that there be, and hereby is, granted' to the company every alternate section of the lands designated, which implies that the property itself is passed, not any special or limited interest in it. The words also import a transfer of a present title, not a promise to transfer one in the future. The route not being at the time determined, the grant was in the nature of a float, and the title did not attach to any specific sections until they were capable of identification; but, when once identified, the title attached to them as of the date of the grant, except as to such sections as were specifically reserved. It is in this sense that the grant is termed one in præsenti; that is to say, it is of that character as to all lands within the terms of the grant, and not reserved from it at the time of the definite location of the route."

Counsel for appellants place strong reliance on the opinion of the court in Wyoming v. United States, 255 U. S. 489, 41 S. Ct. 393, 394, 65 L. Ed. 742. In that case, the state of Wyoming had acquired title to certain school lands which were subsequently embraced within a forest reservation, and, under the terms of the act creating the forest reserve, the state was given the option of selecting nonmineral, nonoccupied lands, anywhere within the state in lieu of school lands situated within the forest reserve, and to which the title was surrendered to the government. The state selected the lands in question in that case, and transmitted all necessary documents and papers to the Department of the Interior for approval. The approval was withheld for a period of three years, during which time it was discovered that the lands were valuable for oil. The Secretary, for that reason, canceled the selection.

The question there involved was whether or not title to the lieu land vested in the state when the state had complied with all the requirements of the act, and submitted its documents and papers to the Secretary for approval, or whether the vesting of the title in the lieu lands depended upon the ultimate approval of the selection by the Secretary. The court held as follows: "In principle it is plain that the validity of the selection should be determined as of the time when it was made, that is, according to the conditions then existing. The proposal for the exchange of land without for land within the reserve came from Congress. Acceptance rested with the state and of course would be influenced and controlled by the conditions existing at the time. It is not as if the selection was merely a proposal by the state which the land officers could accept or reject. They had no such option to exercise, but were charged with the duty of ascertaining whether the state's waiver and selection met the requirements of the congressional proposal and of giving or withholding their approval accordingly. The power confided to them was,

not that of granting or denying a privilege to the state, but of determining whether an existing privilege conferred by Congress had been lawfully exercised; in other words, their action was to be judicial in its nature and directed to an ascertainment and declaration of the effect of the waiver and selection by the state in 1912."

It will be observed that the court was not there considering an original grant of school land, but an exchange of title of school land, which it already possessed, for lieu lands under an option proposed by Congress. The state had a perfect title to the tract in the forest reserve, and the land selected in lieu thereof was vacant, unappropriated, and not known, or believed to be, mineral. Consequently, the court held that, when the state surrendered title to its school land and filed its application for the lieu lands, complying with all the conditions laid by Congress, the action of the Secretary was merely judicial, and that the title to the lieu lands vested as of the date of the filing by the state of its acceptance of the terms of the act and not as of the date of the approval or disapproval by the Secretary.

But we are considering here a different proposition. In the grant of school lands, a privilege is extended to the state, which matures only when all the conditions of the grant have been met, and the time for fulfilling those conditions is confided in the Secretary of the Interior. As was said in the Wyoming Case, "the Land Department uniformly has ruled that the states acquire a vested right in all school sections in place which are not otherwise appropriated, and not known to be mineral, at the time they are identified by the survey—or at the date of the grant where the survey precedes it—regardless of when the matter becomes a subject of inquiry and decision, and that this right is not defeated or affected by a subsequent mineral discovery."

Section 11 of the Enabling Act of the State of New Mexico, 36 Stat. 565, incorporates the provisions of the Act of August 18, 1894, 28 Stat. 394. Under that act the state may request that surveys may be made for the purpose of identifying land granted to the State by act of Congress, and a preference right is created in the State to any land so surveyed, operative from the time of the request for survey. Where survey is made under such request, the title relates back to the date of the request for survey, but there is nothing in this case showing that any request had been made by the state for the survey of the lands in question, and we are relegated to the provisions of the Enabling Act, which provides that the lands granted for school purposes shall vest in the state only when unappropriated or nonmineral at the time the survey in the field is made.

■ We have no difficulty in arriving at the conclusion that the vesting of title in the school land here in question was dependent upon the survey, and we are forced to the conclusion that, notwithstanding the language of the act "survey in the field," it must be interpreted as a completed survey finally approved by the Secretary of the Interior. In the case of Heydenfeldt v. Daney Gold Mining Company, 93 U. S. 634, 638, 23 L. Ed. 995, mineral had been discovered and a patent had been issued to the land by the government between the date of the school grant and the date of the survey. The act (March 21, 1864, 13 Stat. 32, § 7) provided, among other things: "That sections numbers sixteen and thirty-six, in every township, and where such sections have been sold or otherwise disposed of by any act of congress, other lands equivalent thereto * * * shall be, and are hereby, granted to said state for the support of common schools."

The defendant's claim was made prior to the survey of the section in question. It was held that until the survey and its approval the lands were subject to the disposition of Congress, and the language of present grant was deemed to be subject to the words of qualification. The court said that Congress intended to place "Nevada on an equal footing with States then recently admitted. Her people were not interested in getting the identical sections 16 and 36 in every township. Indeed, it could not be known until after a survey where they would fall, and a grant of quantity put her in as good a condition as the other States which had received the benefit of this bounty. A grant, operating at once, and attaching prior to the surveys by the United States, would deprive Congress of the power of disposing of any part of the lands in Nevada, until they were segregated from those granted. In the mean time, further improvements would be arrested, and the persons, who prior to the surveys had occupied and improved the country, would lose their possessions and labor, in case it turned out that they had settled upon the specified sections."

The court held further in this case that Congress reserved absolute power over the lands until their status became fixed by survey, and that the state being compensated by other lands equal in quantity was fully in-

demnified, and that settlers developing the unsurveyed lands could do so with no risk of losing the labor of years..

In the case of United States v. Morrison, 240 U. S. 192, 36 S. Ct. 326, 333, 60 L. Ed. 599, the court was there considering not a grant of school lands in præsenti but in futuro, where the state of Oregon was granted sections 16 and 36 for school purposes under an act (9 Stat. 330, § 20) which provided, among other things, as follows: "That when the lands in the said Territory shall be surveyed under the direction of the government of the United States, preparatory to bringing the same into market, sections numbered sixteen and thirty-six in each township in said Territory shall be, and the same is hereby, reserved for the purpose of being applied to schools in said Territory, and in the States and Territories hereafter to be erected out of the same."

The court in the Morrison Case seemed to ignore the distinction between a present and future grant in relation to unsurveyed school lands, and this, we think, is a correct interpretation of the various acts of Congress granting school lands to the state, and the uniform course of administration that has been followed by the Department of the Interior. Since the unsurveyed lands are in the nature of a float, as said of the railroad lands, until surveyed they are subject not only to disposition by Congress, but to the conditions provided in the acts whereby the state may be required, upon identification of the lands by survey, to take indemnity lands in lieu thereof.

In the Morrison Case, between the date of the survey in the field and its approval by the surveyor general of Oregon and the examination and approval by the Commissioner, the lands in controversy were withdrawn for forestry purposes; and it is contended that, inasmuch as the survey in the field had been completed and approved by the surveyor general, the lands came within the provisions of the school land grant; but the court, holding the contrary, said: "The making of the field survey and its approval by the surveyor general of Oregon did not make the survey complete as an official act. It still remained subject to the examination and approval of the Commissioner, and for that purpose copies of the plat of survey and field notes were transmitted to the Commissioner, who, not being satisfied, required a supplemental report. The matter was still in abeyance when the lands in controversy were withdrawn for forestry purposes by the Secretary of the Interior."

The court, further considering the case, held that it was immaterial that the plat furnished by the surveyor general had been used officially by the Commissioner of the General Land Office and the Secretary of the Interior in connection with the withdrawal of the land for forestry purposes; and, in support of this, the court said: "These lands still remain to be officially defined in the appropriate manner * * * pending certain investigations. We think that it is immaterial that the survey was finally approved by the Commissioner without modification, for pending the approval it remained in his hands, officially incomplete, awaiting the result of his examination. Again, it is urged that the survey, when approved, related back to the date of the grant, or at least to the date of the survey in the field. The former contention is but a restatement in another form of the argument that Congress could not dispose of the land pending the survey, which, as we have seen, is answered by the terms of the grant; and if Congress had this power of disposition, it must mean that the lands could be disposed of under the authority of Congress at any time before the survey became a completed administrative act. The doctrine of relation cannot be invoked to destroy this authority."

It is settled law that whether the grant be one in præsenti or in futuro, as said in the Wyoming Case, "that the states acquire a vested right in all school sections in place which are not otherwise appropriated, and not known to be mineral, at the time they are identified by the survey." Of course, if it be a present grant, it applies immediately to lands surveyed at the time of the grant. It follows, therefore, we think, that the same rule applies as to unsurveyed lands, whether the grant be present or future. The survey must be a completed one, approved by the Secretary of the Interior, before the title of the state attaches or becomes vested.

The facts in the Morrison Case are even stronger than those in the present case. There the survey in the field had been approved by the surveyor general, whose duty it is to supervise surveys in the field and report them to the Land Department. Here the survey in the field had not been approved by the surveyor general. The approval or disapproval was being held in abeyance by the supervising officer in the field when the stock driveway withdrawal was made; hence the sur-

vey was not even a completed survey in the field. There is no theory upon which the contention of the state, that title to the lands in question had vested in the state, can be sustained.

The judgment is affirmed.