**B.K. HERNDON, Margaret T. Debruin, and Crater Title Insurance Company, Plaintiffs,**

v.

**The UNITED STATES, Defendant.**

**No. 95–71C.**

United States Court of Federal Claims.

July 29, 1996.

Jerome C. Muys (Beth S. Ginsberg, of counsel), Washington, D.C., for plaintiffs.

Mark A. Melnick, Washington, D.C., with whom were Frank W. Hunger, Assistant Attorney General, and David M. Cohen, Director, for defendant.

## ORDER

MOODY R. TIDWELL, III, Judge:

This case is before the court on defendant's motion to dismiss for failure to state a claim pursuant to RCFC 12(b)(4), plaintiffs' motion to amend the complaint to add Oregon as a party plaintiff, and the parties' cross motions for summary judgment. Because plaintiffs did not have a compensable interest in the property at the time of the alleged takings, they have no standing in this matter. The court heard oral argument on April 30, 1996. For the reasons discussed below, the court grants defendant's motion to dismiss; plaintiffs' motion to amend the complaint to add Oregon as a party plaintiff is denied; and the parties' cross motions for summary judgment are moot.

1. *See generally Oregon v. Bureau of Land Management,* 876 F.2d 1419, 1421–24 (9th Cir.1989) (summarizing the long and complicated history of Oregon indemnity selections of state school grant lands).

## STATUTORY BACKGROUND

When Oregon was admitted to the Union in 1859, the United States designated certain federal lands that would be granted to the state in support of its public schools. Oregon Admission Act, 11 Stat. 383. If these lands had previously been appropriated for another purpose the state would be allowed to make indemnity selections of other lands in lieu of state school grant lands.[1] Indemnity Act of 1891, 43 U.S.C. §§ 851–873. In accordance with this statutory authority, the Secretary of Interior was charged with promulgating regulations governing applications for indemnity selections of lands in lieu of state school grant lands. Interpreting these initial regulations, the Supreme Court held that a state's application for school indemnity selections, like the acceptance of an offer, could not be rejected if it satisfied all legal requirements. *Wyoming v. United States,* 255 U.S. 489, 496–97, 41 S.Ct. 393, 394–95, 65 L.Ed. 742 (1921); *Payne v. New Mexico,* 255 U.S. 367, 371, 41 S.Ct. 333, 334–35, 65 L.Ed. 680 (1921).

The existing land grant process became more complex with the enactment of the Taylor Grazing Act of 1934, 43 U.S.C. §§ 315–315r, which authorized the Secretary of Interior to withdraw up to 80 million acres of unappropriated federal lands for placement in grazing districts. The Taylor Grazing Act delegated discretionary authority to the Secretary to classify the withdrawn public lands according to the highest and best use.[2] *Id.* § 315. The effect of this withdrawal and discretionary authority was to bar state school indemnity selections of any withdrawn lands until the Secretary classified the lands as available for that kind of selection. *Andrus v. Utah,* 446 U.S. 500, 511, 519–20, 100 S.Ct. 1803, 1809, 1813–14, 64 L.Ed.2d 458 (1980) (interpreting *Wyoming* and *Payne* in light of the discretionary authority delegated to the Secretary of Interior under 43 U.S.C. 315f). Thus, the Taylor

2. The Secretary of Interior was charged with promulgating regulations governing petitions for classification of lands. In this opinion, "classification" refers to the procedures for evaluating land use proposals in accordance with the highest and best use of public lands.

Grazing Act added an additional requirement to the existing application process, namely a petition for classification pursuant to 43 C.F.R. §§ 2410.0–2 to 2411.2 (1968).[3]

Since 1934, applications for selection have routinely been accompanied by or combined with petitions for classification, reflecting both the original requirements of the Indemnity Act and the subsequent requirements of the Taylor Grazing Act. *Andrus,* 446 U.S. at 511, 519–20, 100 S.Ct. at 1809, 1813–14 (recognizing the petition for classification as another legal requirement for selections, in addition to the preexisting application process upheld in *Wyoming* and *Payne* ). If granted, a petition for classification entitles an applicant to a "preference right" to the land selected, before other potential claimants.[4] 43 U.S.C. § 315f; 43 C.F.R. § 2411.1–4. However, an applicant must still complete all legal requirements of the application for selection in order to obtain title to the land. 43 U.S.C. §§ 851–852; 43 C.F.R. § 2222.1 to .1–5 (1968). The regulations governing classification expressly state that after lands are classified, all other legal requirements governing the selection must be satisfied in order for title to vest. 43 C.F.R. § 2411.1–6. Thus, as reflected by the Supreme Court's analysis in *Andrus,* since 1934, dual legal requirements must be satisfied before an equitable interest vests: 1) an applicant must do all that is legally required to perfect its application for selection; and 2) the Secretary must approve the applicant's petition for classification of the land. *See Andrus,* 446 U.S. at 520, 100 S.Ct. at 1813–14.

One legal requirement for completing the application for selection is publication of notice of the applicant's selection in a local newspaper in order to allow other claimants an opportunity to protest the selection. 43 C.F.R. §§ 1824.0–1, 2222.1–4 (1968). In 1968, when Oregon made its application for selection, the publication requirement stated in relevant part:

(a) The state will be required to publish once a week for five consecutive weeks ... at its own expense in a designated newspaper and in a designated form, a notice allowing all persons claiming the land adversely to file in the appropriate office their objections to the issuance of a certification to the state for lands selected under the law.

(b) The state must file a statement of the publisher, accompanied by a copy of the notice published, showing that publication has been had for the required time.

43 C.F.R. § 2222.1–4. The Supreme Court acknowledged this notification requirement as one of the prerequisites of perfecting state indemnity selection applications. *Payne,* 255 U.S. at 369–70, 41 S.Ct. at 334.

## FACTS

In 1967, plaintiffs received certificates from the Oregon State Land Board reflecting Oregon's intent to convey title to approximately 720 acres to plaintiffs. Title was to pass upon Oregon's receipt of state indemnity selections in lieu of school grant lands from the United States. These certificates were issued to compensate plaintiffs' predecessors-in-interest for previous land grants that were subject to prior appropriations and therefore unavailable.

In 1968, Oregon initiated state indemnity selections with the Bureau of Land Management (BLM). Pursuant to the Taylor Grazing Act, BLM granted Oregon's petition for classification of the land as available for indemnity selection in lieu of unavailable school grant lands, and noted the classification on the master plats. Oregon's application for selection remained pending during a BLM audit of Oregon's prior indemnity selections to determine whether Oregon had exceeded its allotted school land grants during the state's long and complicated history of indemnity selections.[5]

3. In this opinion, all citations to the Code of Federal Regulations refer to the 1968 regulations, which were in effect at the time Oregon filed its petition-application.

4. A preference right, like a right of first refusal, bars other applicants from selecting the same

land during the pendency of an application. 43 C.F.R. § 2411.1–4.

5. *See Oregon,* 876 F.2d at 1422–24 (describing how 47,000 acres of Oregon's prior indemnity selections were fraudulently acquired by the "Hyde Fraud Combine," and later offered by

In 1973, BLM rejected Oregon's pending application, concluding that Oregon had already exceeded its allotted school land grants. Lengthy litigation followed, in which Oregon challenged the basis for BLM's rejection of its application. During this period, the United States still held title to the land and BLM continued to manage the land, granting rights of way in 1976, and a timber contract in 1989. These BLM actions, which occurred during the litigation following BLM's rejection of Oregon's application, are at issue in this case as alleged takings of plaintiffs' property.

In 1992, the Court of Appeals for the Ninth Circuit clarified the impact of previous fraudulent transactions upon Oregon's pending application, and remanded the case to the district court for its determination of the precise acreage remaining for Oregon's selection. *Oregon*, 876 F.2d at 1430, 1432. On remand, the District Court for the District of Oregon found that Oregon did have sufficient remaining indemnity selections to support its 1968 application. *Oregon v. Bureau of Land Management*, No. 85–646–MA, slip op. at 3, 1991 WL 110206 (D.Or. June 17, 1991). In light of that decision, BLM rescinded its 1973 decision and reinstated Oregon's application for selection. Oregon's application was subsequently approved and finally perfected in May 1992, when Oregon published notice of its selection. Thereafter, Oregon conveyed title to plaintiffs in July 1993.

Plaintiffs complain that the 1976 grants of rights of way and 1989 timber contract constituted a taking of property interests by the United States which entitles them to just compensation under the Fifth Amendment.[6] The United States asserts that plaintiffs did not have a compensable interest in the property at the time of the alleged takings. These claims raise two central issues: a threshold issue, of whether plaintiffs had a sufficient interest in the land at the time of the alleged takings to have standing to assert a takings claim against defendant; and if so, whether BLM's actions constitute compensable takings.

Oregon as base land in its 1929–1932 land exchanges with the United States).

## DISCUSSION

◾ The Supreme Court set forth the standard for evaluating motions to dismiss for failure to state a claim in *Conley v. Gibson*, 355 U.S. 41, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). *Conley* provides that "a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that [plaintiffs] can prove no set of facts in support of [their] claim which would entitle [them] to relief." *Id.* at 45–46, 78 S.Ct. at 102. Furthermore, the court must construe the allegations in the complaint favorably to plaintiffs. *Hamlet v. United States*, 873 F.2d 1414, 1416 (Fed.Cir.1989) (citing *Scheuer v. Rhodes*, 416 U.S. 232, 236, 94 S.Ct. 1683, 1686, 40 L.Ed.2d 90 (1974)). This court has held that dismissal under RCFC 12(b)(4) can only be granted if the defendant is able to establish an "insurmountable bar" to plaintiffs' relief. *Chavez v. United States*, 15 Cl. Ct. 353, 356 (1988). Because plaintiffs' interest in the land at the time of the alleged takings was insufficient for them to have standing to assert a takings claim against the United States, they have failed to state a claim upon which relief can be granted.

### I. Plaintiffs' Interests

◾ It is well established that a party cannot maintain a takings claim unless it owned the property at the time the alleged taking occurred. *United States v. Dow*, 357 U.S. 17, 22, 78 S.Ct. 1039, 1044–45, 2 L.Ed.2d 1109 (1958); *Cooper v. United States*, 827 F.2d 762, 764 (Fed.Cir.1987); *Cavin v. United States*, 19 Cl.Ct. 190, 197 n. 4 (1989), *aff'd in relevant part*, 956 F.2d 1131 (Fed.Cir. 1992). This court has held that parties who did not have a compensable property interest on the date of an alleged taking do not have standing and therefore fail to state a claim upon which relief can be granted. *Creppel v. United States*, 33 Fed.Cl. 590, 600 (1995); *accord Persyn v. United States*, 34 Fed.Cl. 187, 203 (1995); *Martin v. United States*, 30

6. The Fifth Amendment provides in relevant part: "nor shall private property be taken for public use, without just compensation." U.S. Const. Amend. V.

Fed.Cl. 542, 551, *aff'd,* 41 F.3d 1519 (Fed.Cir. 1994). For relief to be granted for the alleged takings in this case plaintiffs must have had a compensable interest in the property at the time that BLM granted the rights of way in 1976, or the timber contract in 1989.

■ In 1967, the Oregon State Land Board issued certificates to plaintiffs, as successors-in-interest, indicating Oregon's intent to convey title to acreage to them following state indemnity selections. However, Oregon did not file its petition-application for indemnity selection of that land until 1968. Oregon law expressly prohibited the conveyance of title from the state to future grantees, except "upon approval of such selection and upon receipt by the state of evidence that the title to such selected lands ha[d] passed to the state." OR.REV.STAT. § 273.620(2) (1967). Accordingly, Oregon could not have legally conveyed a compensable interest in the property to plaintiffs until it received title from the United States. Oregon did not receive such title from the United States until 1993. Thus, the certificates themselves only indicated Oregon's intent to convey the acreage in the future, conditioned upon Oregon's receipt of the land from the United States. This created in plaintiffs and their predecessors-in-interest a "mere expectancy" of a future property interest vis-a-vis the United States, conditioned upon Oregon's selection.[7] "Plaintiffs are not entitled to compensation for a mere expectancy." *Applegate v. United States,* 35 Fed. Cl. 406, 420 (1996) (citing *Deltona Corp. v. United States,* 228 Ct.Cl. 476, 490–91, 657 F.2d 1184 (1981), *cert. denied,* 455 U.S. 1017, 102 S.Ct. 1712, 72 L.Ed.2d 135 (1982)). A "mere expectancy is not property" compensable under the Fifth Amendment. *Id.*

No chain of title was forged between plaintiffs and the United States until Oregon's application for selection was perfected and Oregon received title to the land from the United States in 1993. Because plaintiffs did not obtain a compensable interest in the property until July 1993, long after the alleged takings occurred, plaintiffs have no rights against the United States in this matter and therefore have no standing to assert a takings claim.

■ Plaintiffs sought to cure the threshold standing issue by amending the complaint to add Oregon as a party plaintiff. However, as set forth in the following discussion, plaintiffs' motion to amend their complaint would not change the outcome here. Analysis of plaintiffs' interests required the court to trace the chain of title from the United States to Oregon in 1992, and thereafter from Oregon to plaintiffs in 1993, revealing that plaintiffs' motion to amend the complaint is futile.

## II.  Oregon's Interest

RCFC 21 provides that the court may add parties "at any stage of the action and on such terms as are just." Under RCFC 15(a), "a party may amend [its] pleadings only by leave of court ... and leave shall be freely given when justice so requires." The Supreme Court established the following test for evaluating amendments to complaints:

> In the absence of any apparent or declared reason—such as undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of the amendment, etc.—the leave sought should be freely given.

*Foman v. Davis,* 371 U.S. 178, 182, 83 S.Ct. 227, 230, 9 L.Ed.2d 222 (1962); *accord Mitsui Foods, Inc. v. United States,* 867 F.2d 1401, 1403–04 (Fed.Cir.1989). This court has frequently applied the *Foman* test. *E.g., St. Paul Fire & Marine Ins. Co. v. United States,* 31 Fed.Cl. 151, 153–55 (1994); *Joseph Morton Co. v. United States,* 3 Cl.Ct. 780, 784 (1983), *aff'd,* 757 F.2d 1273 (Fed.Cir. 1985). In accordance with this test, the leave sought to add Oregon as a party plaintiff

---

7. *See Lucas v. South Carolina Coastal Council,* 505 U.S. 1003, 1027, 112 S.Ct. 2886, 2899, 120 L.Ed.2d 798 (1992) (identifying the nature of the property interest as a "logically antecedent inquiry" to takings analysis); *see also M & J Coal Co.*

*v. United States,* 47 F.3d 1148, 1153–54 (Fed.Cir.) (conducting a logically antecedent inquiry into the nature of the property interest), *cert. denied,* —— U.S. ——, 116 S.Ct. 53, 133 L.Ed.2d 18 (1995).

would be "freely given," but for the "futility of the amendment."

Plaintiffs' motion to amend the complaint is futile, because Oregon did not have a compensable interest in the property at the time the alleged takings occurred. Neither legal nor equitable interest vested in Oregon until it satisfied the dual legal requirements of the Taylor Grazing Act and the Indemnity Act, i.e., until: 1) the Secretary approved Oregon's petition for classification; and 2) Oregon did all that was legally required to perfect its application for selection. *See Andrus,* 446 U.S. at 520, 100 S.Ct. at 1813–14.

BLM received Oregon's petition-application in April 1968, and in October 1968 the Secretary forwarded final confirmation of a favorable classification of the land as available for selection by Oregon. This act of the Secretary satisfied the legal requirement for classification pursuant to the Taylor Grazing Act. BLM duly noted the classification on its master plats to identify Oregon's preference right and thus segregate the land.[8] However, the other legal requirement, the application for selection pursuant to the Indemnity Act, was not satisfied until May 1992. Although Oregon ultimately prevailed in its challenge to BLM's audit, the application for selection was not reinstated until the litigation was concluded in January 1992. Upon reinstatement, Oregon perfected its application for selection by publishing the requisite notice in May 1992.

Plaintiffs do not contest that Oregon did not publish the requisite notice of its application for selection until 1992. Rather, plaintiffs argue that the segregative effect of the favorable classification and its corresponding notation on the master plats *alone* conveyed an equitable interest in the land from the United States to Oregon. This view does not give full effect to the dual legal requirements of both the Taylor Grazing Act and the Indemnity Act, because it disregards the application for selection requirement of the Indemnity Act. *Wyoming,* 255 U.S. at 489, 41 S.Ct. at 393; *Payne,* 255 U.S. at 367, 41 S.Ct. at 333. The Supreme Court did not overrule *Wyoming* or *Payne* when it later considered the relationship between the two statutes, but rather interpreted the holdings in light of the additional legal requirements of the Taylor Grazing Act. *Andrus,* 446 U.S. at 511, 519–20, 100 S.Ct. at 1809, 1813–14. Both the petition for classification and the application for selection are necessary to vest an applicant with a compensable property interest, but neither requirement alone is sufficient to vest any interest in the land, even an "equitable" interest.[9]

The favorable classification of the land as available for indemnity selection and the corresponding notation of Oregon's petition on the master plats had a "segregative effect," which conferred upon Oregon only a preference right to the land before other potential claimants.[10] 43 C.F.R. §§ 2013.3–2(a), 2410.1–4(a), 222(c), 2411.1–4 (1968). An equitable interest in the land did not vest in Oregon until all other legal requirements of its application for selection were satisfied. *Wyoming,* 255 U.S. at 496–97, 41 S.Ct. at 394–95; *Payne,* 255 U.S. at 371, 41 S.Ct. at 334–35. Thus the alleged takings occurred before a compensable interest vested in Oregon, while the United States still owned the land. Neither the statute nor the corresponding regulations suggest that the favorable classification severed BLM's responsibility for managing the land until Oregon's application for selection was perfected. Once all legal requirements were met in May 1992, including the publication of notice, Oregon acquired an equitable interest in the land. At that point, the United States retained only

8. *See* 43 C.F.R. § 1813.1–1(b) (providing in relevant part that "notations shall be made on the tract books and plats of all applications and entries of public lands, regardless of their character").

9. The regulations governing classifications expressly contradict plaintiffs' argument that classification alone is sufficient to vest an interest in the land. 43 C.F.R. § 2411.1–6 ("after lands are classified . . . all the laws and regulations governing the particular kind of entry, location, selection, or other disposal must be complied with in order for title to vest or other interests to pass").

10. BLM defines the "segregative effect" of applications as a temporary effect that "prevent[s] any disposition of the public lands or resources involved until application is adjudicated." UNITED STATES DEP'T OF INTERIOR, GLOSSARY OF PUBLIC LAND TERMS 47 (1959).

bare legal title to the property, holding the land in trust for the state until title was formally patented to Oregon in January 1993.

Plaintiffs' motion to amend the complaint to add Oregon would be futile, because Oregon's interest in the property was also insufficient at the time of the alleged takings for Oregon to have standing to assert a takings claim against the United States. Accordingly, plaintiffs' motion to amend the complaint, filed October 4, 1995, is denied.

### CONCLUSION

Because plaintiffs did not have a compensable interest in the property at the time of the alleged takings, they have no standing against the United States in this matter and therefore fail to state a claim upon which relief can be granted. Accordingly, defendant's motion to dismiss is granted; plaintiffs' motion to amend is denied; and the parties' cross motions for summary judgment are moot. The Clerk is directed to dismiss plaintiffs' complaint. No costs.

**IT IS SO ORDERED.**