747 P.2d 1183

Frank and Lorain KADISH; Marion L. Pickens; and the Arizona Education Association, a non-profit corporation, Plaintiffs–Appellants,

v.

ARIZONA STATE LAND DEPART-MENT, an agency of the State of Arizona; Joe T. Fallini, in his capacity as the State Land Commissioner; and Cyprus Pima Mining Company, on behalf of itself and others similarly situated, Defendants–Appellees,

ASARCO Incorporated, a New Jersey corporation; Magma Copper Company, a Delaware corporation; James P.L. Sullivan, Esq.; Eisenhower Mining Company, a partnership; and Can–Am Corporation, an Arizona corporation, Intervenors–Appellees.

No. CV–86–0238–T.

Supreme Court of Arizona.

Dec. 10, 1987.

Reconsideration Denied Feb. 2, 1988.

Arizona Center for Law in the Public Interest by David S. Baron, Amy J. Gittler, Tucson, for plaintiffs-appellants.

Robert K. Corbin, Atty. Gen. by James T. Skardon, Asst. Atty. Gen., Phoenix, for defendants-appellees Arizona State Land Department and Fallini.

Lewis and Roca by Tom Galbraith, Phoenix, for defendant-appellee Cyprus Pima Mining Co.

Kaufman, Apker & Nearhood, P.C. by Burton M. Apker, Phoenix, for intervenors-appellees ASARCO Inc. and Eisenhower Mining Co.

Twitty, Sievwright & Mills by Howard A. Twitty, Phoenix, for intervenor-appellee Magma Copper Co.

James P.L. Sullivan, pro se.

Molloy, Jones, Donahue, Trachta, Childers & Mallamo, P.C. by Mark S. Sifferman, Phoenix, for intervenor-appellee Can–Am Corp.

New Mexico State Land Office by Arthur J. Waskey, Louhannah M. Walker, Santa Fe, for amicus curiae New Mexico Com'r of Public Lands.

FELDMAN, Vice Chief Justice.

Frank and Lorain Kadish, Marion Pickens, and the Arizona Education Association, petitioners, brought a taxpayers' action against the Arizona State Land Department and others. The issue raised is whether the fixed royalty provisions of A.R.S. § 27–234(B), permitting the land department to lease minerals on a flat rate royalty, violate the appraisal and true value provisions of the Arizona Enabling Act and the comparable provisions of the state constitution.

### FACTS AND PROCEDURAL BACKGROUND

The individual petitioners are taxpayers who allege that their taxes support public education in Arizona. The Arizona Education Association represents approximately 20,000 public school teachers throughout the state. All petitioners contend that the provisions of A.R.S. § 27–234(B),[1] fixing a

---

1. *Every mineral lease of state land shall provide for payment to the state by the lessee of a royalty of five per cent of the net value of the minerals produced from the claim.* The net value is deemed to be the gross value after processing, where processing is necessary for commercial use, less the actual cost of transportation from the place of production to the place of processing, less costs of processing and taxes levied and paid upon the production of the minerals. In case of minerals not processed for commercial use, the net value is the gross proceeds, or gross

flat rate, five percent royalty on minerals extracted from leased state school trust land impermissibly result in the extraction of minerals without payment of full value to the school trust. Petitioners claim that such a limitation of income is contrary to the appraisal and true value requirements of the Enabling Act and the Arizona Constitution. They seek a declaration that A.R.S. § 27–234(B) is void and ask for appropriate special action relief.[2]

The defendants originally named were the Arizona State Land Department, the State Land Commissioner, and Cyprus Pima Mining Company, a mineral lessee. The trial court allowed other mineral lessees of state school trust lands (Magma Copper Company, ASARCO, Inc., James Sullivan, Eisenhower Mining Company, and Can–Am Corporation) to intervene as defendants. (Original and intervenor defendants are hereafter referred to as "respondents.") The trial court eventually certified the case as a defendant class action pursuant to Rule 23, Ariz.R.Civ.P., 16 A.R. S. The class consists of all present and future mineral lessees of state lands.

The parties filed cross motions for summary judgment. The trial court granted respondents' summary judgment motions, and held A.R.S. § 27–234(B) did not violate the Arizona Enabling Act or the Arizona Constitution. Petitioners timely moved for an order transferring the case from division one of the court of appeals to this court. We granted the motion because the issues in this case are matters of first impression and substantial statewide importance. See Rule 19, Ariz.R.Civ.App.P., 17A A.R.S. We have jurisdiction pursuant to Ariz. Const. art. 6, § 5, A.R.S. §§ 12–102, –2103, and Rules 8 and 9, Ariz.R.P. Spec.Act., 17A A.R.S. We now reverse the judgment below, and remand with instruc-

tions to enter summary judgment in favor of petitioners.

## HISTORICAL BACKGROUND OF THE ARIZONA ENABLING ACT

■ The issue before us can neither be understood nor resolved without an understanding of the historical process from which it evolved. In 1910, the Arizona–New Mexico Enabling Act became law, authorizing the people of the territories of Arizona and New Mexico to form state governments. Act of June 20, 1910, Pub.L. No. 219 (ch. 310), 36 Stat. 557. Sections 19 through 35 of the Act referred exclusively to the proposed state of Arizona.[3] The Enabling Act included provisions that confirmed prior land grants to the Arizona Territory and granted still more land to the new state. In 1911, the Arizona electorate accepted the land grants by ratifying art. 10, § 1 of the Arizona Constitution. The full provisions of the Enabling Act became part of the organic law of this state. Ariz. Const. art. 20, ¶ 12. See also Gladden Farms, Inc. v. State, 129 Ariz. 516, 518, 633 P.2d 325, 327 (1981). Because federal law is supreme in this field, neither this court, nor the legislature, nor the people may alter or amend the trust provisions contained in the Enabling Act without congressional approval. Murphy v. State, 65 Ariz. 338, 181 P.2d 336 (1947).

Pursuant to the Enabling Act, the United States granted four sections of land in each township to Arizona. Almost ten million acres were granted. The land could be used only for the support of the common schools of the state (school trust lands) and for internal improvements to the state. See generally Dunipace, Arizona's Enabling Act and the Transfer of State Lands for Public Purposes, 8 ARIZ.L.

value, at the place of sale or use, less the actual cost of transportation from the place of production to the place of sale or use, less taxes, if any, levied and paid upon the production of the minerals. The lease shall not require the payment of any royalty in advance of actual production of minerals from the claim. A.R.S. § 27–234(B) (Supp. 1987) (emphasis added).

2. In Arizona, relief formerly obtained by writs of prohibition, mandamus or certiorari is now obtained by "special action." Rule 1, Ariz.R.P. Spec.Act., 17A A.R.S.

3. Unless specifically stated to the contrary, all future references in this opinion to the Enabling Act pertain to the Arizona Enabling Act.

REV. 133 (1966). The school land trust now encompasses approximately nine and one-half million acres. AUDITOR GENERAL, A PERFORMANCE AUDIT OF THE STATE LAND DEPARTMENT, at 2 (1987).

Section 28 of the Enabling Act prohibited the sale, conveyance, or encumbrance of any part of the school trust land "except to the highest and best bidder at a public auction" after notice "duly given by advertisement." The state could dispose of the land or its products only if it obtained "true value" as determined by a prior appraisal. No disposal could be made "for a consideration less than the value so ascertained." Finally, § 28 provided that every disposition of the land or its products "not made in substantial conformity with the provisions of this Act [would be] null and void, any provisions of the constitution or laws of the said State to the contrary notwithstanding." Except for several matters irrelevant to the case before us, art. 10 of the Arizona Constitution is "practically a rescript of section 28 of the Enabling Act." *Murphy*, 65 Ariz. at 348, 181 P.2d at 342.

*Murphy* capsulizes the historical reasons for the stringent provisions of the Enabling Act. Land grant acts similar to our Enabling Act previously had authorized the formation of other state governments. These acts had given the new states authority to determine how school trust lands were to be sold and the proceeds preserved for trust purposes. The result of this largess was highly unsatisfactory:

> The sad experience of Congress with the handling by these twenty-three states of the granted lands, the sale thereof, and the investment of monies derived from a disposition of the granted lands, brought about a new policy which found expression in the Enabling Act for New Mexico and Arizona. The dissipation of the funds by one device or another, sanctioned or permitted by the legislatures of the several states, left a scandal in virtually every state, and these granted lands and the monies derived from a disposition thereof were so poorly administered, so unwisely invested and dissipated, that Congress concluded to make sure, in light of experiences of the past, that such would not occur in the new states of New Mexico and Arizona.

*Murphy*, 65 Ariz. at 351, 181 P.2d at 344.

To ensure that Arizona and New Mexico would not dissipate the assets granted, Congress required that they hold the granted land in trust and enacted the restrictive provisions of § 28 of the Enabling Act noted above. 65 Ariz. at 351–52, 181 P.2d at 344–45, citing the report of Senator Beveridge, Chairman of the Committee on Territories, S.Rep. No. 454, 61st Cong., 2d Sess. (1910). *See also* 45 Cong.Rec. 8227 (1910) (explanation by Senator Beveridge in floor debate concerning strict safeguards on land transferred to the state of Arizona).

Congress's concerns were well-founded. New Mexico's experience was sadly typical. Despite the stringent trust restrictions of its Enabling Act, the New Mexico legislature enacted laws permitting the disposition of trust assets in a manner that breached the trust. *See, e.g., Ervien v. United States*, 251 U.S. 41, 40 S.Ct. 75, 64 L.Ed. 128 (1919). In Arizona, the legislature authorized the investment of school trust funds in first mortgages upon supposedly valuable reclaimed farm land. These speculative expenditures were at best "non-beneficial." *See Murphy*, 65 Ariz. at 357, 181 P.2d at 348. The legislature eventually had to compensate the trust fund for the resulting losses by appropriating money out of the general fund. *See Udall v. State Loan Board*, 35 Ariz. 1, 273 P. 721 (1929); Laws of 1929, ch. 94.

■ Thus, the general intent of Congress is clear. It intended the Enabling Act to severely circumscribe the power of state government to deal with the assets of the common school trust. The duties imposed upon the state were the duties of a trustee and not simply the duties of a good business manager. *See generally County of Skamania v. State*, 102 Wash.2d 127, 685 P.2d 576 (1984) (when managing and administering the trust lands, the state must comply with the same fiduciary obligations as apply to a private trustee). The grant in trust was intended to curb the

power of the state to deal with the trust lands in the "prophetic realization, ... that the state might [otherwise be] lured from patient methods to speculative advertising ... in the hope of a speedy prosperity." *Ervien*, 251 U.S. at 47–48, 40 S.Ct. at 76. Thus, to comply with congressional intent, we must strictly apply the Enabling Act's restrictions regarding disposal of school trust assets.

With these principles in mind, we turn now to the specific provisions in the Enabling Act as originally adopted and as amended from time to time by Congress.

## TREATMENT OF MINERAL LANDS UNDER THE ENABLING ACT AND ITS AMENDMENTS

### A. *The Enabling Act as Originally Drafted*

Section 24 of the original Enabling Act excluded mineral lands from the initial grant to the state, but allowed the state to select "indemnity" sections in lieu of those lands. Thus, under the provisions of the original act, title to "known" mineral lands did not vest in the state, even though the land might have been one of the sections described in the grant. *See United States v. Sweet*, 245 U.S. 563, 38 S.Ct. 193, 62 L.Ed. 473 (1918). This exclusion created some difficulty as two types of mineral lands emerged. The first were lands "of a known mineral character at the time the initial grant vested in the states," while the second consisted of land "not known to be mineral in nature at the time of vesting, but upon which minerals were subsequently discovered." Note, *State Mineral Leases on Arizona School Lands*, 15 ARIZ.L. REV. 211, 219 (1973); *see also West v. Standard Oil Co.*, 278 U.S. 200, 49 S.Ct. 138, 73 L.Ed. 265 (1929). The United States Supreme Court construed the grant to mean that states acquired vested rights in all school trust sections not known to be mineral at the time of the grant. The rights thus acquired were not defeated by subsequent mineral discovery. *Wyoming v. United States*, 255 U.S. 489, 41 S.Ct. 393, 65 L.Ed. 742 (1921). Because of the mineral land exclusion, however, title to the

school grant lands which theoretically vested in the state at the time Arizona was admitted to the Union could be defeated if an adverse claimant established that at the time of admission the lands were known to be mineral lands. This dilemma was recreated in each of the other eleven western land grant states having mineral land exclusions in their respective enabling acts. *See* Report of Rep. Sinnott, Chairman of the Committee on Public Lands, House Hearings on S.Rep. No. 1761, 69th Cong., 2d Sess., at 2 (1926). *See also* 68 Cong. Rec. 1815–17, 1820–24, 2581 (1927) (floor debate on reasons for amendment of enabling acts). Of course, this situation left title to large tracts of land unsettled.

### B. *The Jones Act of 1927*

To remedy this problem, Congress ultimately confirmed the entire school land grant to the western land grant states, regardless of the known or unknown mineral character of the land. *See* Act of Jan. 25, 1927, Pub.L. No. 570 (ch. 57), 44 Stat. 1026 ("Jones Act"). The Jones Act solved the vesting problem regarding mineral lands and required the western land grant states to reserve the mineral rights on any lands sold. It also gave the states authority to lease mineral deposits. The Jones Act made absolutely no mention of the Arizona Enabling Act provisions requiring disposition of school trust lands only after notice, advertisement, public auction, and sale to the highest bidder. More significantly, it also left untouched the provisions providing for appraisal and for sale for true value at not less than the appraised price. But, in prohibiting the outright sale of mineral lands except with a royalty reservation, and in permitting lease of "coal and mineral deposits," the Jones Act further provided that such deposits "[should] be subject to lease by the State as the State legislature may direct, the proceeds and rentals and royalties therefrom to be utilized for the support or in aid of the common or public schools."

### C. *Do Disposal Restrictions Apply to Mineral Lands?*

■ Respondent Magma contends that lease of mineral deposits was never cover-

ed by the disposal restrictions of § 28 of the Enabling Act, and to this day has not been included within those restrictions. This argument is only half correct. The Enabling Act of 1910 did not cover mineral leases simply because, under the grant, Arizona was not supposed to receive any mineral lands. However, that changed dramatically in 1927 when, by the Jones Act, Congress confirmed the vesting of *all* lands encompassed by the original grant of numbered sections to Arizona and the other land grant states. The Jones Act stated:

> [T]he several grants to the States of numbered sections in place for the support or in aid of common or public schools be, and they are hereby, extended to embrace numbered school sections mineral in character.... (a) *That the grant of numbered mineral sections* under this Act *shall be of the same effect as prior grants for the numbered nonmineral sections,* and titles to such numbered mineral sections shall vest in the States at the time and in the manner and be subject to all the rights of adverse parties recognized by existing law in the grants of numbered nonmineral sections.

Pub.L. No. 570, 44 Stat. 1026 (1927) (emphasis added).

The quoted language indicates a clear intent that nonmineral lands that had vested under the prior land grant acts together with the mineral sections vesting under the Jones Act should be held for the school trust purposes and under the same trust and dispositional restrictions as the vested nonmineral sections. Arizona, along with the other eleven land grant states, could now hold its mineral lands in the same way (to "the same effect") as its nonmineral lands.

The language of the 1910 Enabling Act had imposed restrictions on disposition of school trust land expressly applicable to "[a]ll lands, leaseholds, timber, and other products of land." Enabling Act, § 28. That statute further stated that the "[d]isposition of any of said lands, or of any

money or thing of value directly or indirectly derived therefrom ... in any manner contrary to the provisions of this Act, shall be deemed a breach of trust." *Id.* We believe these words accomplished just what the text clearly states: all land vesting in the school trust and all products of the lands were subject to the trust's dispositional restrictions. *See, e.g., Farmers Investment Co. v. Pima Mining Co.,* 111 Ariz. 56, 523 P.2d 487 (1974) (groundwater); *Department of State Lands v. Pettibone,* 702 P.2d 948, 954–56 (Mont.1985) (groundwater and surface water rights). Thus, when Arizona obtained full vesting of mineral lands through the Jones Act in 1927, the dispositional restrictions and provisions of the 1910 Enabling Act became applicable to both the original lands and newly-acquired and vested mineral lands.[4]

### D. *The 1936 and 1951 Amendments*

Congress amended § 28 of the Enabling Act, in part again to clarify mineral lease problems, by the Act of June 5, 1936 (Pub. L. No. 658 (ch. 517), 49 Stat. 1477), which provided for the lease of mineral lands for a term of twenty years or less, and permitted leasing of agricultural and grazing land "in a manner as the State legislature may direct." The Enabling Act was again amended by the Act of June 2, 1951 (Pub.L. No. 44 (ch. 120), 65 Stat. 50) to provide that nothing in § 28 (which contained the restrictions on disposition of school lands):

> shall prevent: ... 2) the leasing of any of said lands, in such manner as the Legislature of the State of Arizona may prescribe, ... for mineral purposes, ...

Pub.L. No. 44 (ch. 120), 65 Stat. 50, 50 (1951). The 1951 amendment did remove the advertisement, bidding, and appraisal requirements for leases of hydrocarbon minerals, but it did not specify any changes in the leasing provisions for other types of minerals.

---

**4.** *See also Jensen v. Dinehart,* 645 P.2d 32, 37 (Utah 1982) (Oaks, J., concurring and dissenting) ("There are no words in the Jones Act or its legislative history that exhibit any intent to re-

move or modify the trust restriction Congress had imposed on sections granted under the Enabling Act.").

### E. The Current Version of the Enabling Act

As the result of the amendments described above, the current version of § 28 of the Enabling Act (and basically of the Arizona rescript, art. 10, §§ 1, 3, and 4) reads as follows in relevant part:

That it is hereby declared that *all lands* hereby granted, including those which, having been heretofore granted to said Territory, are hereby expressly transferred and confirmed to the said State, *shall be by the said State held in trust, to be disposed of in whole or in part only in manner as herein provided* and for the several objects specified in the respective granting and confirmatory provisions, *and that the natural products and money proceeds of any of said lands shall be subject to the same trusts* as the lands producing the same.

\* \* \* \* \* \*

*Said lands shall not be sold or leased, in whole or in part, except to the highest and best bidder at a public auction* ... notice of which public auction shall first have been duly given by advertisement [there follows numerous specifications for the contents and manner of publication of the advertisement].... *Nothing herein contained shall prevent:* (1) the leasing of any of the lands referred to in this section, *in such manner as the Legislature of the State of Arizona may prescribe,* for grazing, agricultural, commercial, and domestic purposes, for a term of ten years or less; (2) *the leasing of any said lands, in such manner as the Legislature of the State of Arizona may prescribe, ... for mineral purposes,* other than for the exploration, development and production of oil, gas and other hydrocarbon substances, for a term of twenty years or less; (3) the leasing of any said lands ... for the exploration, development and production of oil, gas and other hydrocarbon substances ... the leases to be made in any manner, with or without advertisement, bidding, or appraisement, and under such terms and provisions as the Legislature of the State of Arizona may

prescribe, the terms and provisions to include a reservation of a royalty to said State of not less than 12½ per centum of production....
*All lands, leaseholds,* timber *and other products* of land, before being offered, *shall be appraised at their true value, and no sale or other disposal thereof shall be made for a consideration less than the value so ascertained....*

(emphasis added).

## THE CENTRAL ISSUE

In this court, respondents have focused their argument on the issue we believe is central to the case. Respondents rely on the phrase that first appeared in 1927 as part of the Jones Act amendment and which was basically continued in the subsequent amendments of 1936 and 1951. The pertinent language now states that nothing in § 28 of the Enabling Act shall prevent "the leasing of any of said lands, in such manner as the Legislature of the State of Arizona may prescribe ... for mineral purposes ... for a term of twenty years or less." The respondents contend that these words give Arizona "full authority to set the terms of 20 year mineral leases, including the establishing of royalty rates, without the appraisement, advertising and bidding process...." Answering Brief of Cyprus, ASARCO, and Eisenhower, at 8.

Thus, they conclude that A.R.S. § 27–234(B), which permits leases at a flat rate "royalty of five per cent of the net value of the minerals produced from the claim," is a proper exercise of the power given the state legislature, even if such a flat rate, statutory royalty results in some leases being made for less than the "true value" of the royalty interest.

### A. Congressional Intent

To resolve this central issue, we now examine the intent of Congress with respect to the wording upon which respondents rely. The original Enabling Act contained the prohibitions already discussed, but provided for one exception: that "nothing herein contained shall prevent said proposed state from leasing any of said lands

... for a term of five years or less without said advertisement herein required." Act of June 20, 1910, Pub.L. No. 219, § 28, 36 Stat. 557. The 1927 Jones Act, passed to resolve the mineral land title problem, for the first time permitted the lease of mineral sections "as the State legislature may direct." Pub.L. No. 570, 44 Stat. 1026. The 1936 act changed the wording to read that "nothing ... shall prevent said State of Arizona from leasing in a manner as the State legislature may direct, any of said lands ... for grazing and agricultural purposes for a term of ten years or less, or ... for mineral purposes [including oil and gas leases] for a term of twenty years or less." Act of June 5, 1936, Pub.L. No. 658 (ch. 517), 49 Stat. 1477.

■ Respondents contend that Congress intended the language used in the 1927 and 1936 amendments to permit the state to deal with mineral deposits on school trust lands in an unrestricted manner. We disagree for several reasons. First, an amendment ought not to be interpreted so broadly as to destroy the entire objective of the statutory scheme. Permitting disposal of vast mineral deposits at less than true value is completely contrary to the objectives sought by the restrictive wording of other portions of the Enabling Act. As the Oklahoma Supreme Court indicated in considering a similar problem, "[c]ommon sense dictates" against finding such an inexplicable congressional intent in dealing with mineral deposits. *Oklahoma Education Association v. Nigh*, 642 P.2d 230, 237 (Okla.1982) (court construed the Oklahoma enabling act provision which permitted leasing of trust lands "under such rules and regulations as the Legislature ... may prescribe" as giving the legislature authority only to enact provisions designed to achieve the trust objectives of protection and maximum return of assets).

We should not interpret these amendments so that a "potentially self-defeating incompatability exists between the stated purpose and objective of the trust on the one hand, and the alleged unbridled authority granted the State Legislature to defeat that strategy by means of creative rules and regulations on the other hand." *Id.;* see also *State Land Department v. Tucson Rock & Sand Co.*, 12 Ariz.App. 193, 195, 469 P.2d 85, 87 (1970) (the phrase "such manner as the legislature may direct" does not permit disposal free from § 28 restrictions, but merely gives the legislature authority to regulate the manner in which the lease is made and to set lease terms that do not conflict with § 28), *vacated on other grounds*, 107 Ariz. 74, 481 P.2d 867 (1971).

We believe there is a rational and consistent explanation for the congressional amendments. As we have noted, the Jones Act was intended to resolve the title vesting problems inherent with mineral lands in the original grant to Arizona and other western states. It was also intended to prohibit the sale of mineral deposits, while still allowing their leasing on a royalty basis for terms of five years or less. Thus, in our view, the Jones Act provision that minerals could be leased "as the State legislature may direct" is more logically to be interpreted as part of the provision prohibiting the sale of mineral deposits but still permitting their lease on a royalty basis. It is not an unbridled grant of power that would allow the legislature to avoid the trust restrictions and duties imposed by the entirety of the Enabling Act. It gives the legislature power to regulate the overall manner of the making of the lease, and the general terms of the lease, so long as there is substantial conformity to the restrictions of § 28. *Tucson Rock & Sand Co., supra.*

The 1936 amendment merely extends the concept of "short-term" leases from five years to twenty years. The congressional record of the 1936 act indicates no intent to alter the basic trust duties and dispositional restrictions imposed on the Arizona state government. *See generally* S.Rep. No. 1939, 74th Cong., 2d Sess. (1936); H.R.Rep. No. 2615, 74th Cong., 2d Sess. (1936).

More importantly, Congress was quite aware of just how to give states the right to make mineral leases without meeting the appraisal or true value requirements of the Enabling Act. This can be seen from a brief look at New Mexico history. In 1922,

the New Mexico Supreme Court held that mineral deposits on school trust lands might be leased without complying with the appraisal and true value requirements of the New Mexico Enabling Act. *Neel v. Barker*, 27 N.M. 605, 204 P. 205 (1922). The lands at issue had been given to the New Mexico Territory under a pre–1910 congressional grant, but the court held that the New Mexico Enabling Act was not applicable to mineral lands no matter when obtained.

The decision was not tested in federal court. Entertaining serious doubts about the *Neel* decision, and concerned about the validity of titles that might vest under the holding, the New Mexico legislature petitioned Congress to authorize a state plebiscite to codify the rule of *Neel. See* 69 Cong.Rec. 1517–18, 2094–95 (1928) (explanations in floor debates by New Mexico representative and senator concerning need for and limited purpose of proposed joint resolution). Congress responded by passing a joint resolution giving the electors of New Mexico the right to amend their state constitution. *See* Joint Resolution No. 7, 45 Stat. 58 (1928). *See generally* S.Rep. No. 90, 70th Cong., 1st Sess. (1928); H.R. Rep. No. 332, 70th Cong., 1st Sess. (1928). The new provision would permit state land

mineral leases without appraisement, advertisement, or competitive bidding, though the proceeds were still to be used for school trust purposes.[5] The 1928 resolution applied solely to New Mexico and did not mention Arizona at all.[6]

The joint resolution indicates to us that had Congress intended that either the Jones Act or the 1936 amendment permit Arizona to engage in mineral leasing without compliance with the original appraisal and true value requirements, it would have used explicit language to accomplish that result, just as it did for New Mexico in Joint Resolution No. 7. The failure to do so in either the Jones Act, which came one year before the joint resolution, or in the 1936 amendment, which came eight years later, and the retention of the unqualified language regarding appraisal and true value in the paragraph of § 28 which follows the mineral lease provision, indicate to us that Congress did not intend Arizona to be free from the dispositional restrictions of the Enabling Act.

The latest and most dramatic revisions of the Arizona Enabling Act in 1951 greatly reinforce this conclusion. In that statute (Pub.L. No. 44, 65 Stat. 51), despite a broader recommendation by the Secretary

5. The complete text of Joint Resolution No. 7 is given:

> *Resolved by the Senate and House of Representatives of the United States of America in* Congress *assembled,* That consent is hereby given and granted to the State of New Mexico and the qualified electors thereof to vote upon the question of amending the constitution of said State and to amend the same by the adoption of the following amendment proposed by the legislature of said State at its eighth regular session by H.J.Res. 8, approved March 11, 1927, to be designated as Article XXIV, said amendment being as follows, to wit:
>
> "Article XXIV
> "CONTRACTS FOR THE DEVELOPMENT AND PROTECTION OF MINERALS ON STATE LANDS
> "*Leases and other contracts, reserving a royalty to the State for the development and production of any and all minerals* on lands granted or confirmed to the State of New Mexico by the Act of Congress of June 20, 1910, entitled 'An Act to enable the people of New Mexico to form a constitution and State

government and be admitted into the Union on an equal footing with the original States,' *may be made under such provisions relating to the necessity or requirement for or the mode and manner of appraisement, advertisement, and competitive bidding, and containing such terms and provisions, as may be provided by act of the legislature;* the rentals, royalties, and other proceeds therefrom to be applied and conserved in accordance with the provisions of said Act of Congress for the support or in aid of the common schools, or for the attainment of the respective purposes for which the several grants were made."
> Consent is also given and granted to said State to enact such laws and establish such rules and regulations as it may deem necessary to carry such constitutional provision into full force and effect should the same be duly and legally adopted.
> Approved, February 6, 1928.
> (emphasis in second paragraph added).

6. At a general election held on November 6, 1928, the New Mexico electorate added the substance of Joint Resolution No. 7 to the New Mexico Constitution as its Article XXIV.

of the Interior,[7] Congress specifically removed the appraisal, bidding, and advertising restrictions of § 28, but *only* as they applied to leases of oil, gas, and other hydrocarbon substances. *See generally* 97 Cong.Rec. 3628–29, 5731–32 (1951) (floor debates); *see also* S.Rep. No. 194, 82d Cong., 1st Sess. (1951); H.R.Rep. No. 429, 82d Cong., 1st Sess. (1951).

In its report, the Senate Committee on Interior and Insular Affairs described the effect of the 1951 amendment as one that

> would change existing law by—(1) Permitting oil and gas leases to run for as long as oil and gas is produced in paying quantities ... (2) Reserving a royalty to the State of not less than one-eighth of production from such [hydrocarbon] leases; and (3) Extending the exemption from the restrictions contained in the original Enabling Act which now applies to agricultural and grazing lands to include also commercial and homesite leases.

S.Rep. No. 194, 82d Cong., 1st. Sess., at 2 (1951).[8]

In our view, the 1951 report of the Senate committee does not indicate a congressional belief that the 1927 Jones Act (permitting leasing on such terms "as the State legislature may direct") or the 1936 amendment (permitting mineral leasing "in a manner as the State legislature may direct") had effectively withdrawn mineral leasing from the stringent dispositional requirements of § 28 of the original Enabling Act. Further, neither the report nor the wording of the text itself permits us to conclude that Congress intended to accomplish such a result by the 1951 amendment. With respect to short term, nonhydrocarbon mineral leases, the 1951 amendment merely paraphrases in substantially identical terms the 1927 and 1936 wordings permitting grazing, agricultural, and mineral "leasing in a manner as the State legislature may direct."

Significantly, just as it had with 1928 Joint Resolution No. 7 pertaining only to New Mexico, in the 1951 amendment Congress again showed that when it wished to permit the state unrestricted authority to lease it would do so explicitly. The words it used in 1951 apply to oil, gas, and hydrocarbons alone. They are:

> Nothing herein contained shall prevent: (2) the leasing of any of [school trust lands] in such manner as the Legislature of the State of Arizona may prescribe, ... for mineral purposes, other than ... oil, gas, and other hydrocarbon substances, for a term of twenty years or less; (3) the leasing of any of said lands, ... for ... *oil, gas, and other hydrocarbon substances, ...* [these types of] *leases to be made in any manner, with or without advertisement, bidding, or appraisement, and under such terms and provisions as the Legislature of the State of Arizona may prescribe, the terms and provisions to include a reservation of a royalty to said State of not less than 12½ per centum of production.*

Pub.L. No. 44, 65 Stat. 51 (1951) (emphasis added). Here again, Congress showed that when it intended to free the state from the dispositional restrictions, it would do so explicitly.

Neither the text of the 1951 amendment nor the congressional intent to be derived from the record as a whole permits us to conclude that the procedure *explicitly* authorized only for the lease of oil, gas, and hydrocarbon deposits is also somehow to apply to other types of mineral deposits. Moreover, if Congress did not regard the dispositional restrictions of the original Enabling Act as effective against mineral leases, why did it bother to create specific exemptions in 1951 for oil, gas, and other hydrocarbon leases? Obviously, Congress made those specific 1951 exemptions precisely because it believed the Enabling

---

7. Letter dated July 20, 1950 from Oscar L. Chapman, Secretary of the Interior, to Hon. Joseph C. O'Mahoney, Chairman of the Senate Committee on Interior and Insular Affairs. S.Rep. No. 194, 82d Cong., 1st Sess. at 3–4 (1951).

8. The "exemption" referred to in clause 3 relates to the time extensions given in the 1936 amendment allowing the state to lease certain types of lands without the need for advertisement. *See* Pub.L. No. 658, 49 Stat. 1477 (1936).

Act's stringent conditions were still in force.

## B. *Prior Judicial Construction*

If we were inclined to reach a contrary conclusion on congressional intent and textual meaning, we would be promptly disabused by a review of the caselaw. In *State v. Lassen*, 99 Ariz. 161, 407 P.2d 747 (1965), this court held that the state had no obligation to compensate the school trust fund for a taking of school trust land made for the purpose of highway construction. The theory was that the construction of the highway across such trust lands would enhance the value of the remainder of trust land in an amount exceeding the value of the property taken for the highway. Rejecting this argument, the United States Supreme Court reversed, holding unanimously that the disposal restrictions of § 28 of the Enabling Act applied to the taking. *Lassen v. Arizona ex rel. Arizona Highway Department*, 385 U.S. 458, 87 S.Ct. 584, 17 L.Ed.2d 515 (1967).[9] The Court stated that the Enabling Act "unequivocally demands" that the trust fund be paid the full value of any lands transferred from it. *Id.* at 466, 87 S.Ct. at 588.

Of course, in *Lassen* the Court was dealing with the conveyance of surface rights rather than with lease of mineral deposits. Any question about the application of the *Lassen* rule to mineral leases was dispelled by *Alamo Land & Cattle Co. v. Arizona*, 424 U.S. 295, 96 S.Ct. 910, 47 L.Ed.2d 1 (1976). In *Alamo*, the United States government had condemned school trust lands, and the question before the Court pertained to the division of the compensation award between the state, as owner of the fee title, and a lessee of a short term grazing lease. In effect, the lessee claimed a larger share of the compensation award on the theory that the lease had a bonus value because the rent contract was less than the fair rental value of the land.[10]

In commenting on the validity of a school trust leasehold made for less than fair rental value, Justice Blackmun, writing twenty-five years after the 1951 amendment and speaking for a seven-member majority of the Court, stated:

> The New Mexico–Arizona Enabling Act has a protective provision against the initial setting of lease rentals at less than fair rental value. This is specifically prohibited by § 28. The prohibition is given bite by the further very drastic provision that a lease not made in substantial conformity with the act "shall be null and void." Thus, if the lease of trust lands calls for a rental of substantially less than the land's then fair rental value, it is null and void and the holder of the claimed leasehold interest could not be entitled to compensation upon condemnation.

*Alamo*, 424 U.S. at 304–05, 96 S.Ct. at 917. Later in the opinion, Justice Blackmun rejected an argument advanced by the state with respect to its power to grant compensable property interests to lessees with the following comment:

> One seemingly apparent and complete answer to this argument is that such § 28 goes on to authorize specifically a lease of trust land for grazing purposes for a term of 10 years or less, and further provides that a leasehold, before being offered, shall be appraised at "true value." ... Full appraised value is to be determined and measured at the times of disposition of the respective interests, and if the State receives those values at those respective times, the demands of the Enabling Act are met.

424 U.S. at 306–07, 96 S.Ct. at 917–18.

These statements seem fully dispositive of the issue. Respondents claim, however, that the quoted statements from the majority opinion in *Alamo* are both nonbinding dicta and an incorrect interpretation of the

---

9. The *Lassen* case is discussed in Casenote, 9 ARIZ.L.REV. 113 (1967); Casenote, 42 WASH.L. REV. 912 (1967).

10. Of course, the arguments made by respondents in this case with respect to short term mineral leases are equally applicable to short term grazing and agricultural leases, the lease of which was allowed by the 1936 and 1951 amendments in the same sentence as that allowing for leases of hard rock minerals.

statutes and congressional intent. Even if we were to agree that the statements are dicta, we are not disposed to disregard the clear words of the United States Supreme Court on a matter of such vital public interest. For purists, however, we note our belief that the statements are not dicta. The Court remanded with instructions that the district judge determine whether Alamo held a valid leasehold and, if so, how it was to be evaluated. Finally, it instructed that if the leasehold value did prove to be substantially in excess of the rental set by the state, the district court should determine "whether it is permissible to find from that fact a violation of the Enabling Act's requirement" of appraisal and true value. *Alamo*, 424 U.S. at 312, 96 S.Ct. at 920; *see also id.* n. 12. As we read the *Alamo* opinion, if the district court were to make such a finding, then the principles of law announced in the opinion would render the lease invalid, leaving the lessee no right to share in the award. Given the instructions on remand, we believe the Court's statements of the applicable principles of law are not dicta but are essential guidelines to the eventual disposition of the case.

Concluding this point, we reject the argument that the Supreme Court erred in its interpretation of congressional intent. We disagree with the contention and also regard it as having been made in the wrong forum.

Respondents argue that in *Farmers, supra,* this court held that short term mineral leases were exempt from the appraisal and true value restrictions of the Enabling Act. We do not agree. In *Farmers,* the issue was the validity of a lease authorizing the extraction of groundwater from school trust land without public auction and bidding. We held that groundwater was a product of the land, rather than a mineral, and that the state could not lease the right to withdraw water without public auction and bidding. In so doing, we noted in passing that the groundwater lease was different from a mineral lease, and stated that "[m]inerals are expressly excepted in § 28 and are subject to disposition as provided by the Legislature of the State." 111 Ariz. at 58, 523 P.2d at 489. We do not

believe that this simple statement, made without analysis of the entire complex question presented in the present case, is equivalent to a holding that the state may lease the right to extract minerals from school trust land for less than the true, appraised value. In any event, this court has no power to overrule *Alamo*. *Farmers* must be read in conjunction with *Alamo* which, in our view, holds directly contrary to respondents' interpretation of *Farmers*.

## RESOLUTION

### A. *Interpretation of the Enabling Act*

We conclude from the foregoing that the Enabling Act is intended to protect the school trust land from dissipation by the state government. To curb such dissipation, Congress imposed severe restrictions on the method by which the state could sell or lease such lands. Undoubtedly the most important restriction is the appraisal/true value requirement. Furthermore, the amendments to the Enabling Act do not explicitly exempt nonhydrocarbon mineral leases from the restrictions of § 28, as they do oil, gas, and other hydrocarbon leases. As we noted, the congressional record, while equivocal on some points, certainly demonstrates no congressional intent to remove the appraisal, trust, and true value restrictions from mineral leasing.

The Enabling Act is the "fundamental and paramount law" in Arizona. *Murphy,* 65 Ariz. at 345, 181 P.2d at 340. The courts have consistently construed the scope of federal land grants in favor of the government. *Mountain States Telephone & Telegraph Co. v. Kennedy,* 147 Ariz. 514, 516, 711 P.2d 653, 655 (App.1985). In dealing with trust lands in particular, all doubts must be resolved in favor of protecting and preserving trust purposes. *United States v. New Mexico,* 536 F.2d 1324, 1326–27 (10th Cir.1976).

Finally, as we read the views of the United States Supreme Court, as expressed in *Lassen,* and particularly in *Alamo,* we are bound to adopt the construction advanced by petitioners. We hold, therefore,

that the Enabling Act and its rescript in art. 10 of the Arizona Constitution, forbid the state from making nonhydrocarbon mineral leases without appraisal or for less than their true value.

## B. *Validity of the Present Arizona Statute on Mineral Leasing*

■ Respondents contend that the overall effect of A.R.S. § 27–234 benefits the school trust fund. While the application of a flat rate may result in the undervaluation of some leases, respondents argue that the statutory scheme promotes greater mineral exploration and development. Thus, they assert, more minerals are extracted from school trust land resulting in greater overall payments to the state at the five percent flat rate than under an appraisal/true value scheme.

There are two answers to this contention. First, a recent report of the Arizona Auditor General concludes that Arizona, the *only* state with a fixed, nonnegotiable royalty rate for mineral leases, has one of the lowest royalty rates in the nation. AUDITOR GENERAL, A PERFORMANCE AUDIT OF THE ARIZONA STATE LAND DEPARTMENT, at 19 (1980). Respondents do not dispute this fact.[11] Second, it is not certain that higher royalty rates discourage exploration and development and result in lower production. In fact, the data indicate that market forces determine production and royalty rates; a market royalty rate does not have a significant adverse effect on production. Smith, *Elements of Mineral Leasing Systems for State Lands with Comments on the Laws of Selected States*, at 44–47 (1980) (unpublished manuscript); Magma Brief, at A–102 to –105. In addition, we note that the state mineral royalty receipts had declined to $1.3 million in 1986 from the 1980 return of almost $8 million. AUDITOR GENERAL, A PERFORMANCE AUDIT OF THE STATE LAND DEPARTMENT, at 45 (1987). Thus, it appears that the net flat rate statute has not served to protect the state's royalty income from the market-related decline in mineral production of the last decade.

Further, respondents' cause would not be enhanced even if the overall effect of A.R. S. § 27–234(B) encourages greater production so that lessees pay higher total royalties to the state than would be paid on a fair value basis. The United States Supreme Court has specifically rejected such arguments. In *Lassen*, the state argued that the highway department's acquisition of school trust lands for highway purposes without payment would have an overall beneficial effect on the value of the remaining school trust lands. The state posited that the improvements made would enhance the lands' value and thus promote their sale because the highway would make the lands more accessible. The Supreme Court rejected that argument, holding that the fair value requirement could not be discarded on the basis of speculative predictions about possible future development and values. Such methods did not comply with the basic purposes of Congress in imposing trust restrictions. 385 U.S. at 468–69, 87 S.Ct. at 589–90.

Finally, unlike most mineral lease royalties, the Arizona flat rate royalty is computed on the "net value" of the minerals extracted. *See* ROCKY MOUNTAIN MINERAL LAW FOUNDATION, 3 AMERICAN LAW OF MINING ch. 63 (2d ed. 1986). Under the Arizona statute, the net value is determined by subtracting both the cost of extraction and the cost of "processing." Given a gross value set by the market, and deduction of extraction, transportation, and processing costs, many minerals may have no "net value" at all as far as the statutory formula is concerned. Thus, under § 27–234(B) it is possible for a lessee to extract minerals from school trust lands and pay no royalty whatsoever. Of course, we have no way of knowing from this record whether such circumstances have

---

11. *See also* JOINT LEGISLATIVE BUDGET COMMITTEE, FOLLOW–UP REPORT OF PERFORMANCE AUDIT RECOMMENDATIONS FOR THE ARIZONA STATE LAND DEPART-

MENT, at 3–5 (Sept.1982) (use of net royalty results in substantially reduced royalty revenues compared with gross royalty).

existed, but the possibility is implicit in the statute.

The State Land Department contends that we may "save" the statute in question simply by holding that the five percent flat rate royalty is a minimum, below which no lease can be made. Armed with the "such manner as the Legislature directs" wording, the state legisl.ture undoubtedly may set a minimum royalty for each lease of mineral deposits. It is obvious, however, that § 27–234 does just the opposite. The statute does not provide for a five percent minimum with an actual rental to be based upon appraisal and true value. It simply provides for a five percent flat rate. Flat rates set a maximum return. *Tucson Rock & Sand Co., supra.* There is, in short, little to save.

In any event, whatever the overall benefit to the state of a flat net rate scheme, we do not believe that a statute that makes it possible to dispose of trust assets without payment of true value can be upheld under the trust duty concept required by the Enabling Act. *County of Skamania, supra.* We hold, therefore, that A.R.S. § 27–234 violates art. 10 of the Arizona Constitution and § 28 of the Enabling Act. The statute is unconstitutional and void as to nonhydrocarbon mineral leases.[12]

## ATTORNEY'S FEES

We must also consider the matter of attorney's fees. Petitioners seek an allowance of fees against the State Land Department and the State Land Commissioner ("State") on several grounds. First, they claim entitlement to an allowance of fees under A.R.S. § 12–348(A). That statute requires an award of fees to a party who prevails by adjudication on the merits in:

(3) A court proceeding to review an agency decision or any other statute authorizing judicial review of agency decisions;

\*       \*       \*       \*       \*       \*

(5) A special action proceeding brought by the party to challenge an action by the state against the party.

■■■ The State argues that neither of the subsections is applicable. It first urges that this case does not involve a review of the agency decision to award any particular lease nor does any statute authorize judicial review of such decisions of the State Land Department. We agree that this case does not represent a "proceeding to review an agency decision," unless one defines "decision" as encompassing the department's day-to-day operations in making and renewing leases over the years since the legislature enacted § 27–234(B). We do not believe that this is what the legislature intended by the fee statute. In our view, the legislature contemplated a specific proceeding or dispute with an agency in which a particular determination by that agency is challenged and is set aside. *See New Pueblo Constructors, Inc. v. State,* 144 Ariz. 95, 696 P.2d 185 (1985) (court disallowed fees under § 12–348(A)(3) when contractor sued state to obtain damages incurred pursuant to state's breach of construction contract). In the case before us, petitioners challenge the statute the agency applied. They did not ask the court to review an agency decision as required by A.R.S. § 12–348(A)(3). Nor do we believe a fee award can be based on subsection (5). The state took no action "against" petitioners when it awarded leases to respondents.

Petitioners also claim to be eligible for an award of fees under the so-called "substantial benefit doctrine." Under this doctrine, courts have inherent equitable power to award fees, notwithstanding the "American Rule" against recovery of fees in the absence of statutory authority. *See Hall v. Cole,* 412 U.S. 1, 93 S.Ct. 1943 36 L.Ed.

---

12. Arizona contains a wide variety of commercially exploitable hydrocarbon and nonhydrocarbon minerals. See the detailed discussion in COMMITTEE ON INTERIOR AND INSULAR AFFAIRS, MINERAL AND WATER RESOURCES OF ARIZONA, 90th Cong., 2d Sess., at 59–467 (1969). In recent years, Arizona's mines have produced over one billion dollars annually in metallic ores alone. *See, e.g.,* UNITED STATES DEPARTMENT OF THE INTERIOR, BUREAU OF MINES, 2 MINERALS YEARBOOK: 1985, at 59–77 "The Mineral Industry of Arizona" (1985).

2d 702 (1973). Arizona law is cognizant of the substantial benefit doctrine, but has neither adopted nor rejected it. *See State v. Boykin*, 112 Ariz. 109, 113–14, 538 P.2d 383, 387–88 (1975) (vacating the trial court's award of fees based on "inherent power" as an abuse of discretion because the "private attorney general" doctrine was inapplicable where the "appellees were not pressing their claim in hopes of directing 'substantial benefits to the general public.'" 112 Ariz. at 114, 538 P.2d at 388.). In the case before us, unlike *Boykin*, it is obvious that petitioners seek no recovery for themselves, and will achieve no personal advantage. They do not act for their own benefit, nor even for the benefit of a particular class or group, but only for the purpose of vindicating the interests of the entire citizenry of the state of Arizona. *See generally* Note, *Equitable Attorney's Fees to Public Interest Litigants in Arizona*, 1984 ARIZ.ST.L.J. 539 (1984). They have succeeded and have conferred a substantial benefit on the citizens of Arizona. Given these circumstances, and the direct contemplation of the last paragraph of § 28 of the Enabling Act that citizens of the state may act for the benefit of the state as a whole in enforcing the dispositional restrictions of § 28, the author and Chief Justice Gordon believe that an award of fees is proper. *See also* Comment, *Important Rights and the Private Attorney General Doctrine*, 73 CALIF.L.REV. 1929 (1985).

## CONCLUSION

The judgment of the trial court is reversed. The case is remanded with instructions to enter judgment in favor of petitioners, Kadish, Pickens, and the Arizona Education Association. The trial court is instructed to enter a judgment declaring A.R.S. § 27–234 unconstitutional and invalid as it pertains to nonhydrocarbon mineral leases. There being neither a majority nor a plurality in favor of a fee award, no fee allowance is ordered.

Petitioners also sought special action relief from the trial court. It is not possible to tell on this record just what further relief is appropriate. The trial court is instructed to hear arguments and, if appropriate, take evidence on that question and to grant such relief as may be appropriate and consistent with the principles announced in this decision.

GORDON, C.J., concurs.

MOELLER, J., did not participate in the determination of this matter.

HOLOHAN, Justice, concurring.

I concur, except with that portion of the opinion permitting the allowance of fees.

CAMERON, Justice, dissenting.

I regret that I must dissent. We are presented with two questions:

1. Did Congress intend for mineral leases to be subject to the appraisal, competitive bidding, and advertising requirements of Section 28 of the Enabling Act?
2. Does the fixed-rate royalty provision of A.R.S. § 27–234(B) provide maximum revenue for school lands consistent with the trust principles imposed by the Enabling Act on federally granted lands?

I believe the answer to Question 1 is no and the answer to Question 2 is yes. I would, therefore, affirm the decision of the trial court.

### INTENT OF CONGRESS

At the time of enactment, the Enabling Act imposed an appraisal requirement on "[a]ll lands, leaseholds, timber and other products of the land." As originally enacted, the Enabling Act did not grant to the states known mineral lands. Subsequent discovery of minerals on vested lands, however, would not void title. *See Wyoming v. United States*, 255 U.S. 489, 41 S.Ct. 393, 65 L.Ed. 742 (1921).

In 1922, the Supreme Court of New Mexico held that since Congress had not originally contemplated the conveyance of any mineral lands to the state via the Enabling Act, it had not intended that the Enabling Act's leasing provisions should govern mineral leasing procedures. *Neel v. Barker*,

27 N.M. 605, 204 P. 205 (1922). The court held valid an oil and gas lease issued without the procedural requirements of formal appraisal, advertisement, or public auction. *Id.* at 605, 204 P. at 205. Subsequently, the New Mexico Legislature requested that Congress authorize a constitutional amendment codifying *Neel v. Barker.* Congress responded by passing the Act of February 6, 1928, ch. 28, 45 Stat. 58, which authorized New Mexico to lease lands granted under the Enabling Act for mineral purposes without regard to appraisal, advertising, or competitive bidding. The mineral rights in the granted lands, however, could not be sold by the state, but only leased. Following the New Mexico example and as a result of the Jones Act, Arizona, prior to the 1936 amendment, similarly could have leased its granted lands for mineral purposes without complying with the appraisal, advertising, and bidding requirements. Pub.L. No. 570, ch. 57, 44 Stat. 1026 (1927).

The Act of June 5, 1936, ch. 517, 49 Stat. 1477, provided for the lease of mineral lands for a term of twenty years or less, "in a manner as the State legislature may direct." Subsequently, section 28 was amended again by the Act of June 2, 1951, ch. 120, 65 Stat. 50. This amendment liberalized the restrictions placed on school lands, stating in part:

> Nothing herein contained shall prevent: ... 2) the leasing of any of said lands, in such manner as the Legislature of the State of Arizona may prescribe, whether or not also leased for grazing and agricultural purposes, for mineral purposes, other than for the exploration, development, and production of oil, gas, and other hydrocarbon substances, for a term of twenty years or less; ....

Pub.L. No. 44, ch. 120, 65 Stat. 50 (1951); *see* Ariz. Const. art. 10, § 3. Congress, in plain words, granted the Arizona Legislature the power to lease school lands for mineral development for a term of 20 years or less, in such a manner as Arizona's legislature might elect.[1]

In construing the 1936 amendment consistent with its historical background, the state legislature, in prescribing the manner for leasing mineral lands, is not limited by the requirements of appraisal, competitive bidding and advertising.[2] *See Farmers Inv. Co. v. Pima Mining Co.,* 111 Ariz. 56, 58–59, 523 P.2d 487, 489 (1974) ("Minerals are expressly excepted in § 28 and are subject to disposition as provided by the Legislature of the State.") Considering the history of the legislation and the amendments to our Enabling Act, I believe the legislature has the power to provide for leasing of mineral lands without appraisal.

## MAXIMUM RETURN

In 1981, we held that school trust lands could not be sold without public auction to the Arizona Division of Emergency Services (ADES), even though ADES was a state agency. *Gladden Farms, Inc. v. State,* 129 Ariz. 516, 633 P.2d 325 (1981). The court found it important to note that simply because sale of the land in trust was to another state agency, it did not necessarily provide the protection to the trust lands that Congress intended. *Id.* at 520, 633 P.2d at 329. Furthermore, the court also

---

**1.** Speculators mulling the reasons for this liberalization contend that a change in Congressional policy occurred in the 1950s concerning the type of restrictions placed on trust lands. The Alaska Statehood Act, P.L. 85–508, 72 Stat. 339 (1958), for example, imposed no trust provisions or other limitations on Alaska's state lands, *i.e.,* Alaska was given a "free transfer." The Alaska state land policy, therefore, reflects a veritable about-face by Congress when it is compared with the restrictions placed upon Arizona. The potential concerns and harms caused by an absence of trust controls on state land is stated accurately by one commentator: "If there is to be no control over the price of sale or lease, certainly the pro-school forces have sufficient grounds to be alarmed. There could be a total depletion of the trust lands with almost no income—all in the name of the public good." Dunipace, *Arizona's Enabling Act and the Transfer of State Lands for Public Purposes,* 8 ARIZ.L. REV. 133, 138 (1966).

**2.** Minerals clearly are not subject to appraisal as "other products of the land." Because mineral lands were reserved to the federal government under the Enabling Act, Congress could not have contemplated their inclusion in "other products of the land." *See State Land Dept. v. Tucson Rock & Sand Co.,* 107 Ariz. 74, 76, 481 P.2d 867, 870 (1971).

commented that the purpose for the sale of lands in trust is irrelevant; of paramount concern is maximum return from the trust:

However worthwhile and desirable this sale may be for the humanitarian purposes for which it is made, we do not believe that the sale without auction and bid assures the "highest and best" price that the Enabling Act requires. The Enabling Act does not allow trust lands to be used for the purpose of subsidizing public programs no matter how meritorious the programs.

*Id.* at 521, 633 P.2d at 330.

Court opinions concerning the trust land provisions in Arizona strictly interpret the Enabling Act in order to protect the beneficiaries of the trust. Even though mineral leases are exempt from the Enabling Act's formal leasing requirements, mineral lands are included in the corpus of the state trust properties and the state is not absolved from its fiduciary duties as trustee. *Lassen v. Arizona*, 385 U.S. 458, 87 S.Ct. 584, 17 L.Ed.2d 515 (1967). The state, as trustee, acts in a fiduciary capacity in the administration of state trust lands and has a duty to maximize the revenues generated by the trust corpus. If the fixed-rate royalty limits the return from the trust land, then it would be contrary to the provisions of the trust and would be deemed a breach of the trust. Act of June 20, 1910, ch. 310, 36 Stat. 557 § 28. *See also Alamo Land and Cattle Co. v. Arizona*, 424 U.S. 295, 96 S.Ct. 910, 47 L.Ed.2d 1 (1976).

At the time of the filing of the instant case, the relevant portion of A.R.S. § 27–234 provided:

B. Every mineral lease of state land shall provide for payment to the state by the lessee of a royalty of five per cent of the net value of the minerals produced from the claim. The net value shall be deemed to be the gross value after processing, where processing is necessary for commercial use, less the actual cost of transportation from the place of production to the place of processing, less costs of processing and taxes levied and paid upon the production thereof. In case of minerals not processed for commercial use, the net value shall be the gross proceeds, or gross value, at the place of sale or use, less the actual cost of transportation from the place of production to the place of sale or use, less taxes, if any, levied and paid upon the production thereof.

A.R.S. § 27–234(B).

In reviewing the testimony in the trial court, I believe there is sufficient evidence from which it can be found that a royalty of five percent returns an equal if not a greater amount to the school trust account than could be obtained through other methods of leasing. The legislature, in establishing a royalty rate, may balance the revenue to be received with the discouragement of future mining operations that might occur with the imposition of higher royalty rates. Furthermore, it should be noted that mineral deposits are of a unique nature. While timber, range land and even rock and gravel can be easily evaluated and appraised before exploitation, mineral deposits are almost impossible to value until after extensive and often expensive exploration. Such deposits must first be discovered, explored and developed before mining.

In this regard, the statement by the majority should be noted that "the state mineral royalty receipts had declined to $1.3 million in 1986 from a 1980 return of $8 million. . . . It appears that the net flat rate statute has not served to protect the state's royalty income from the market-related decline in mineral production of the last decade." Page 496, 747 P.2d page 1195. I believe this is misleading. The decline in mineral production in the past decade was due to market conditions and not the flat rate royalty. Indeed, rising costs of production of mineral could well have resulted in less production and less revenue. As the brief of Magma Copper pointed out, there is no positive correlation between royalty rates and income derived from state trust lands. To the contrary, the Auditor General's Report shows that California has the highest royalty rate of the states examined, but the revenue derived from all state mineral leases totalled only $259,000 for the fiscal year 1978–79.

Arizona for the same fiscal year generated an income of $3.4 million.

In the appendix to Magma Copper's brief, Spencer Smith stated that he examined the status of California's metallic leases and that: "The ten percent minimum royalty imposed in California is one of the primary reasons for the lack of metallic mineral production on their [California's] state lands." Letter from Spencer A. Smith to C.J. Hansen, President Arizona Mining Association (December 22, 1980) (discussing S. Smith, Elements of Mineral Leasing Systems for State Lands with Comments on the Laws of Selected States (July 7, 1980) (unpublished article)).

I believe that the legislature has properly determined that a fixed-royalty rate appropriately maximizes the revenues to be generated by mineral leases on the school lands. I would hold that A.R.S. § 27–234(B) does not violate the Enabling Act or the Arizona Constitution.

I would affirm the judgment of the trial court.